# IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARA FLAMM, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 02-4302 |
| v. | : | |
| | : | |
| SARNER & ASSOCIATES, P.C. and | : | |
| JOSHUA SARNER, ESQUIRE and | : | |
| LEONARD SARNER, ESQUIRE and | : | |
| JODI H. BROWN, M.D. and JOHN | : | |
| MATUSAVAGE, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE SARNER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CHRISTIE, PABARUE, MORTENSEN and
  YOUNG, A Professional Corporation
James W. Christie (I.D. No. 12068)
JWChristie@cpmy.com
William F. McDevitt (I.D. No. 80206)
WFMcdevitt@cpmy.com
1880 JFK Boulevard - 10th Floor
Philadelphia, PA 19103/ 215-587-1600

Attorneys For Defendants
Sarner & Associates, P.C.;
Joshua Sarner, Esquire and
Leonard Sarner, Esquire
("Attorney Defendants")

471508_1

## TABLE OF CONTENTS

I.     INTRODUCTION - MATTER BEFORE THE COURT ................................................ 1

II.    FACTUAL HISTORY .......................................................................................... 2

      A.    Sarner & Associates' Legal Practice
            Consumer Collections .......................................................................... 2

      B.    Sarner & Associates and Brown v. Flamm
            Initial Litigation .................................................................................. 5

      C.    Sarner & Associates and John Matusavage
            October Service ................................................................................... 5

      D.    Sarner & Associates and Robert Brand
            A Husband's Negotiation ...................................................................... 7

      E.    Sarner & Associates and John Matusavage
            January Service .................................................................................... 7

      F.    Plaintiff's Alleged Damages ....................................................................... 11

III.   PROCEDURAL HISTORY .............................................................................. 13

IV.   LEGAL STANDARD ....................................................................................... 14

V.    LEGAL ARGUMENT ...................................................................................... 15

      A.    The Sarner Defendants Are Not "Debt Collectors"
            Within The Meaning Of The FDCPA And
            Cannot Be Held Liable Under That Statute ......................................... 15

      B.    The Sarner Defendants Cannot Be Held Liable For The
            Actions Of Their Independent Contractor, John Matusavage .............. 18

      C.    The Sarner Defendants Cannot Be Held Liable Under
            The FDCPA For The Service Of Legal Process Alone ....................... 22

      D.    Plaintiff Cannot Set forth A Cause Of Action Under The CPL
            In The Absence Of Ascertainable Damages To Money Or Property ......... 24

      E.    Plaintiff Cannot Set Forth A Claim Of Defamation
            In The Absence Of Damage To Plaintiff's Reputation ......................... 27

F.      Plaintiff Cannot Set Forth A Claim For Conspiracy In The Absence
        Of An Agreement Between The Parties To Commit An Unlawful Act .............. 29

VI.     CONCLUSION .............................................................................................................. 31

## I.    __INTRODUCTION__

Plaintiff Mara Flamm alleges that she was made uncomfortable at work because defendant John Matusavage, purportedly made improper comments about plaintiff to her secretary while serving legal process at her place of employment, Pierce College. The comments at issue were not circulated, did not effect plaintiff's reputation and did not effect her economically. Defendants Joshua Sarner, Esquire (hereinafter "Attorney Sarner") and his firm, Sarner & Associates (collectively "the Sarner defendants") are not alleged to have made the statements in question. The Sarner defendants did not request that their independent contractor make improper comments, only that he serve process. At the time of service, no attorney had entered an appearance on plaintiff's behalf and service at her place of employment was permitted under Pennsylvania's Rules of Civil Procedure.

The Sarner defendants respectfully request that the Court dismiss this action against them as a matter of law. The Sarner defendants cannot be held liable as a "debt collector" under the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (hereinafter "FDCPA"), because they do not regularly conduct debt collection activities.[1] They also cannot be held vicariously liable for the actions of Mr. Matusavage, who was an independent contractor.[2] The Sarner defendants cannot be held liable under the FDCPA for merely directing process to be served upon plaintiff because service of process is not actionable under that statute.[3] The service of process upon plaintiff did not result in an "ascertainable loss of money or property", and therefore is not actionable under Pennsylvania's Consumer Protection Law, 73 Pa.C.S.A. § 201-

---

[1] See Section V.A. below.

[2] See Section V.B. below.

[3] See Section V.C. below.

1, *et seq.*(hereinafter "CPL").[4]  Similarly, because plaintiff admits that she suffered no damage to her reputation, she cannot set forth a claim for defamation or slander.[5]  In the absence of other causes of action and of proof that the Sarner defendants entered into an agreement with Mr. Matusavage to commit an illegal act, plaintiff cannot recover under a theory of conspiracy.[6]

For these reasons, as discussed at length below, the Sarner defendants respectfully request that the Court dismiss plaintiff's each of the Counts of plaintiff's Complaint against them with prejudice.

## II.    **FACTUAL HISTORY**

### A.    **Sarner & Associates' Legal Practice - Consumer Collections.**

In July of 1996, Attorney Sarner joined his father, Leonard Sarner, Esquire,[7] at the law firm of Sarner & Associates.[8]  Prior to joining Sarner & Associates, Attorney Sarner worked in the litigation department of Duane Morris & Heckscher, where he had been a summer associate during law school, and where he worked on what was known alternatively as "the criminal litigation group," "the tax litigation group" or the "special litigation group."[9]  Attorney Sarner did

---

[4] See Section V.D. below.

[5] See Section V.E. below.

[6] See Section V.E. below.

[7] Plaintiff's counsel has indicated to both defendants' counsel and the Court that plaintiff will withdraw her putative claims against Leonard Sarner.  As of this date, no written release has been executed by plaintiff or her counsel, but is expected to be executed and provided to the Court in the near future.

[8] Affidavit of Leonard Sarner, Esquire at ¶ 3, a true and correct copy of which is attached hereto as Exhibit 1 (hereinafter "Ex. 1").

[9] November 17, 2004 deposition of Joshua Sarner, Esquire at pp. 7-9, a true and correct copy of which is attached hereto in excerpted form as Exhibit 2 (hereinafter "Ex. 2").

not engage in collection activities at Duane Morris,[10] and collection activities were not a regular part of his practice at Sarner and Associates.[11]

From 1996 through 2002, Attorney Sarner maintained records concerning the work that he individually brought to the firm. but did not maintain records reflecting work done for the largely flat-fee clients of Sarner & Associates.[12]  Attorney Sarner's individual practice (not counting the work that he did for the existing clients of Sarner & Associates), may be summarized as follows:

| YEARS | TOTAL FILES | TOTAL CLIENTS | COLLECTION FILES | COLLECTION CLIENTS | TOTAL FEES | COLLECTION FEES |
|-------|-------------|---------------|------------------|--------------------|-----------|------------------|
| 1996/1997 | 41 | 32 | --- | --- | | |
| 1998/1999 | 111 | 89 | 3 | 1 | *Redacted per* | |
| 2000/2001/2002 | 162 | 135 | 6 | 3 | *Rule 5.1.3* | |

Ex. 2 at ¶¶ 14 - 34.

Consumer debt collection matters represented 0% of the Sarner defendants' legal practice in 1996-1997; 3.2% of Attorney Sarner's individual practice from 1998-2002 (not counting work that he did for Sarner & Associates' existing clients) and 1.3% of the clients that Attorney Sarner brought to Sarner & Associates from 1998 through 2002; and 3% of the revenues individually generated by Attorney Sarner (not counting work that he did for Sarner & Associates' existing

---

[10] Ex. 2 at p. 9.

[11] Ex. 1 at ¶ 11.

[12] Ex. 1 at ¶¶ 21, 22, 33 and 34.

:401841-1

3

clients) from 1998-2002.[13]  Since these consumer debt collection cases were in litigation, it is difficult to determine the amount of work actually done in any particular year, which may be less than the percentages for aggregate years.  Consumer debt collection activities represent a significantly smaller portion of the approximately *Redacted* in fees generated by Sarner & Associates from 1998 to 1999 and the more than *Redacted* in fees generated by Sarner & Associates from 2000 to 2002.[14]

When Attorney Sarner first joined Sarner & Associates, he was responsible for building a client base and, to that end, filled out referral forms with the Philadelphia Bar Association.[15] Although Attorney Sarner indicated to the Philadelphia Bar Association that, as an attorney, he was qualified to accept collections case, the Sarner defendants do not advertise or promote themselves as collections attorneys.[16]  The Sarner defendants do not currently accept consumer debt collection cases.[17]  They do not and have not hired paralegals or additional secretarial staff to handle debt collections matters and they do not and have not represented any companies who are in the business of collecting consumer debts.[18]

---

[13] Ex. 1 at ¶¶ 40-42.  Paragraph 41 of the affidavit of Joshua Sarner contains a typographical error that resulted in a mathematical error.  Attorney Sarner had three collections clients from 1998 to 2002 - —— *Redacted per Rule 5.1.2* ———————Ex. 1 at ¶¶ 17, 26-28.  The 1.7% figure in ¶ 41 is incorrectly based upon the existence of four (4) collections clients; Dr. Brown was accidentally counted twice because she was counted as a client from 1998 to 1999 and as another client from 2000, 2001 and 2002.

[14] Ex. 1 at ¶¶ 23 and 35.

[15] Ex. 1 at ¶ 12; Ex. 2 at pp. 86-91.

[16] Ex. 1 at ¶ 12; Ex. 2 at pp. 86-91, 157-158.

[17] Ex. 2 at p. 90.

[18] Ex. 2 at p. 157.

**B.    Sarner & Associates and <u>Brown v. Flamm</u> - Initial Litigation.**

In the Fall of 2000, Attorney Sarner attempted, unsuccessfully, to communicate with the plaintiff about delinquent medical bills that she owed to Jodi Brown, M.D.  As a result, Dr. Brown filed a Statement of Claim with the Philadelphia Municipal Court.[19]  Although this Statement of Claim was properly served, plaintiff entered no defense and, on April 4, 2001, a Default Judgment was entered in the amount of $6,280.50 in favor of Dr. Brown against plaintiff.[20]  The Default Judgment was properly served and plaintiff, once again, took no action and made no response.  Thereafter, on October 18, 2001, approximately one year after Attorney Sarner began attempting to communicate with the plaintiff about her unpaid medical bills, he wrote plaintiff via first-class and certified mail and enclosed a Notice of Taking Deposition in Aid of Execution of the aforesaid Default Judgment (hereinafter "Notice").[21]

**C.    Sarner & Associates and John Matusavage - October Service.**

In or around September of 2001, defendant John Matusavage (hereinafter "Mr. Matusavage") contacted Sarner & Associates to offer his services as a process server.[22]  Mr. Matusavage opened his business, alternatively called "John's Investigative Service" and "John's Subpoena Service" between 1985 and 1987.[23]  Mr. Matusavage operated his business by himself,

---

[19]  Plaintiff's Complaint at ¶ 16, a true and correct copy of which is attached hereto as Exhibit 3 (hereinafter "Ex. 3"); Statement of Claim, a true and correct copy of which is attached hereto as Exhibit 4.

[20]  Ex. 1 at ¶ 17; <u>see</u> <u>also</u> Default Judgment a copy of which is attached hereto as Exhibit 5.

[21]  <u>See</u> October 18, 2001 letter from Joshua Sarner, Esquire to Mara Flamm and Domestic Return Receipt, true and correct copies of which is attached hereto as Exhibit 6.

[22]  Ex. 2 at p. 26-27; January 17, 2005 deposition of John Matusavage at pp. 31, a true and correct copy of which is attached hereto in excerpted form as Exhibit 7 (hereinafter "Ex. 7").

[23]  Ex. 7 at pp. 12-13, 74.

from his home as a sole proprietorship.[24]  He paid his expenses from his own pocket including business forms, office supplies and transportation costs.[25]  Mr. Matusavage advertised solely by hand delivering flyers to addresses that he located through the legal directory.[26]  Of the approximately 250 attorneys that he provided services to between 1988 and 2004, none of those attorneys provided Mr. Matusavage with office space, secretarial support or other resources.[27]

Attorney Sarner determined that the Notice should be served upon plaintiff directly and retained Mr. Matusavage to make that service.[28]  This was the first and only case for which Sarner & Associates retained the services of Mr. Matusavage.[29]  Attorney Sarner provided Mr. Matusavage with the plaintiff's name and last known address.[30]  It was determined that plaintiff did not reside at her last known address, but that she worked at Pierce College in Philadelphia.[31]  Mr. Matusavage served the Notice on plaintiff's supervisor, Ms. Perkins on October 26, 2001 (although the Affidavit of Service incorrectly shows the year to be "2000").[32]  The attorney defendants attempted to take the deposition of the plaintiff on December 5, 2001, as scheduled in

---

[24] Ex. 7 at pp. 15-16.

[25] Ex. 7 at pp. 19-20.

[26] Ex. 7 at pp. 17-18.

[27] Ex. 7 at. pp. 23-25.

[28] Ex. 2 at pp. 28-29; Ex. 7 at pp. 32-33.

[29] Ex. 2 at pp. 74-75; Ex. 7 at pp. 32-33.

[30] Ex. 2 at pp. 29-30;  Ex. 7 at pp. 35-36.

[31] Id.  While there is some dispute about whether Attorney Sarner obtained Ms. Flamm's employment information from the internet or whether Mr. Matusavage learned this from one of Ms. Flamm's neighbors, this difference of opinion is not material to the action.

[32] Affidavit of Service, a copy of which is attached to attorney defendants' Motion to Dismiss the plaintiff's (original) Complaint as Exhibit 8.

the aforesaid Notice of Deposition, but the plaintiff, Mara Flamm, did not appear, which is reflected in the transcript of the deposition.[33]

### D.    Sarner & Associates and Robert Brand - A Husband's Negotiation.

In November of 2001, Robert Brand, Esquire (hereinafter "Mr. Brand"), contacted Attorney Sarner concerning the default judgment against the plaintiff.[34]    Although Attorney Sarner's recollection of the conversation(s) is unclear, Attorney Sarner does recall that Mr. Brand represented that he was an attorney that he was Ms. Flamm's husband.    Mr. Brand communicated an offer of $1,200 to satisfy the $6,280.50 judgment, which offer was later revoked.[35]    Mr. Brand did not indicate that he intended to represent plaintiff as her attorney and did not enter his appearance on her behalf.[36]    For this reason, Attorney Sarner felt that any future service in the action should be effected upon plaintiff and not her husband.

### E.    Sarner & Associates and John Matusavage - January Service.

More than two months after last hearing from Mr. Brand or plaintiff, on January 22, 2002, Attorney Sarner served plaintiff via certified mail and first-class mail at both her home and place of business a Court-ordered Rule to Show Cause and Petition to Compel Oral Deposition

---

[33] See December 5, 2001 Deposition Transcript in Jodi H. Brown, M.D. v. Mara Flamm, a copy of which is attached to attorney defendants' Motion to Dismiss the plaintiff's (original) Complaint as Exhibit 9.

[34] Ex. 2 at pp. 40-45.

[35] November 16, 2001 letter From Robert Brand, Esquire to Josh Sarner, Esquire, a true and correct copy of which is attached hereto as Exhibit 10.

[36] Ex. 2 at pp. 43-45.

:401841-1

7

in Aid of Execution of Defendant, Mara Flamm (hereinafter "the Rule").[37]  In addition, Attorney Sarner requested that Mr. Matusavage serve the Rule on the plaintiff at her place of business.[38] Mr. Matusavage has testified that on January 24, 2005, he went to Pierce College and asked a security guard for Ms. Flamm's whereabouts.[39]   When Ms. Flamm was not found in her classroom, Mr. Matusavage went back to the security guard and asked to speak with Ms. Flamm's supervisor.  Mr. Matusavage was connected with Carmita Rutling (hereinafter "Ms. Rutling"), who came down to collect the delivery.  Mr. Matusavage testified that he and Ms. Rutling briefly exchanged words and that the Rule was served without incident.[40]   Mr. Matusavage then completed a Return of Service indicating that the Rule had been served on Ms. Rutling on January 24, 2002, at 1:12 p.m.[41]

At approximately 2:28 p.m. on January 25, 2002, following service of the Rule, Attorney Sarner received a communication from plaintiff's bankruptcy attorney, Jane MacElhenny, indicating that  plaintiff had filed a Chapter 7 bankruptcy petition .[42]  This was the first notice

---

[37] See January 22, 2002 letter, Josh Sarner to Mara Flamm (cc: Robert P. Brand, Esquire), a true and correct copy of which is attached hereto as Exhibit 11.

[38] Ex. 2 at 50-51; Ex. 7 at pp. 56-60.

[39] Ex. 7 at pp. 54-55.

[40] Id.

[41] Ex. 7 at p. 53; January 24, 2002 Return of Service, a true and correct copy of which is attached hereto as Exhibit 12 (hereinafter "Ex. 12")

[42] See January 25, 2002 letter, Jane MacElhenney to Joshua Sarner (sent via facsimile on 1/25/02 at 2:38 p.m.), a true and correct copy of which is attached hereto as Exhibit 13 (hereinafter "Ex. 13").

received by Attorney Sarner indicating that plaintiff was represented by counsel.[43]  By the time

that the notice of bankruptcy had been received, the Rule had already been served.[44]

On January 28, 2002, Mr. Brand wrote a letter to Attorney Sarner alleging that on

January 25, 2002, Mr. Matusavage "screamed" at an administrative assistant of Pierce College

that Ms. Flamm "owes $6,000 to a doctor," that she avoided service of process in the past, that a

sheriff would be sent to arrest her and that she was "a sneaky little thief."[45]  Ms. Rutling later

gave a written statement that said Mr. Matusavage told her he had been coming to Pierce to look

for Ms. Flamm "for over two years" and that she had stolen "thousands of dollars from a

doctor."[46]  During her deposition, Ms. Rutling testified that she did not give credence to Mr.

Matusavage's alleged statements:

> Q.    Did you ever think she was a thief?
>
> A.    No, I had no reason to think she was a thief.
>
>         *             *            *
>
> Q.    Did you think then that that was a true statement that she had stolen money from a doctor?
>
> A.    I didn't know what to think.  I just knew that he was upset and that he was telling me something that I shouldn't have been hearing.

---

[43] Ex. 2 at pp. 62-63.

[44] Although there is a dispute as to whether the Rule was served on January 24 or January 25, 2002, there is no dispute about the time that it was served, 1:12 p.m. Ex. 12. Even assuming that the Rule was served on January 25, 2002, service occurred more than one hour before notice of the bankruptcy was given to Attorney Sarner. Ex. 13. For the purposes of this summary judgment motion, the Sarner defendants assume that the January 24, 2002 date reflected on the return of service is correct.

[45] January 28, 2002 letter from Robert P. Brand, Esquire to Joshua Sarner, Esquire, a true and correct copy of which is attached hereto as Exhibit 14.

[46] Statement of Carmita Rutling, a true and correct copy of which is attached hereto as Exhibit 15.

Q.    But you didn't believe him when he said she stole thousands of dollars?

A.    I don't think I thought about believing him or not believing him, I was just listening.

Q.    I'm looking at your statement. There's a reference here to sneaky little thief. Did you think Mara was a sneaky little thief?

A.    It was just his statement.

Q.    You didn't believe it, though?

A.    It wasn't for me to believe. I couldn't believe he was standing there saying that.

Q.    You didn't think that was true?

A.    No.

*          *          *

Q.    Did he tell you that they were going to arrest her if she didn't come to court?

A.    Yes.

Q.    Did you believe him?

A.    I don't know.

Q.    You don't know if you believed him?

A.    It didn't matter if I believed him or not at the time, I mean, he was saying it.

*          *          *

Q.    Did you believe anything that this guy said about Mara, the process server?

A.    I can't say that I did.

August 16, 2004 Deposition of Carmita Rutling at pp. 61-63, 78, a true and correct copy of which is attached hereto in excerpted form as Exhibit 16 (hereinafter "Ex. 16").

On January 28, 2002, Attorney Sarner spoke with Mr. Matusavage about the alleged January 24, 2002 incident.[47]   Mr. Matusavage denied and continues to deny making any improper comments to Ms. Rutling.[48]   Mr. Matusavage has testified that he does not accept jobs if he is asked to intimidate people.[49]   Attorney Sarner did not call plaintiff a thief in Mr. Matusavage's presence or instruct Mr. Matusavage to serve the Rule in a threatening manner.[50]

The bankruptcy filing mandated that any further action with regard to the default judgment occur through the bankruptcy court. Following the service of the notice of bankruptcy, all communications between Attorney Sarner and Ms. Flamm occurred through plaintiff's counsel, Ms. MacElhenny and Mr. Brand.[51]

### F.    Plaintiff's Alleged Damages.

In this action, plaintiff has alleged that as a result of Mr. Matusavage's January 24, 2002 service of the Rule[52] she has "suffered substantial mental pain, anguish and severe emotional distress" as well as "embarrassment and humiliation."[53]   Specifically, plaintiff has testified that she felt "very, very nervous" until September of 2002 that someone would speak to her Dean

---

[47] Ex. 2 at pp. 65-66.

[48] Ex. 2 at pp. 65-66; Ex. 7 at pp. 68-69.

[49] Ex. 7 at. pp. 29-30.

[50] Ex. 2 at pp. 145-146; Ex. 7 at pp. 60-61.

[51] March 25, 2002 letter from Robert P. Brand, Esquire to Joshua Sarner, Esquire, a true and correct copy of which is attached hereto as Exhibit 17. Prior to this date, Mr. Brand had not identified himself as Ms. Flamm's legal representative regarding the default judgment. Ex. 2 at pp. 43-45.

[52] Ms. Flamm has testified that the October and January 2002 service of the Notice and Rule was the only contact she received at work from any of her creditors, including Attorney Sarner's client, Dr. Brown. August 16, 2004 deposition of Mara Flamm at pp. 60-61, a true and correct copy of which is attached hereto in excerpted form as Exhibit 18 (hereinafter "Ex. 18").

[53] Ex. 3 at ¶ 42 and ¶ 43.

about the default judgment.[54]   During this same period, January of 2002 through September of 2002, plaintiff was pregnant for the first time with twins and was teaching between six and eight English classes at Pierce College.[55]   Plaintiff denies that her pregnancy caused her any anxiety, stress or sleeplessness during her first trimester and denies experiencing any stress from her job.[56]   The only treatment that she sought for her alleged nervousness was accupuncture.[57]

Plaintiff's only alleged financial damages have arisen from retaining counsel to prosecute the instant action.[58]   Plaintiff's job performance was not impaired by her alleged nervousness.[59] Ms. Flamm's reputation at Pierce is favorable and the only person with any knowledge of Mr. Matusavage's alleged statements is her assistant, Ms. Rutling.[60]   Ms. Rutling did not discuss the alleged incident with anyone at Pierce or with anyone who knew Ms. Flamm.[61]   Ms. Flamm has testified that she was uncomfortable around Ms. Rutling after the alleged incident.[62]   However, Ms. Rutling did not notice any change in Ms. Flamm's behavior after the afternoon of January

---

[54] Ex. 18 at pp. 68-69.

[55] Ex. 18 at pp. 69-72.

[56] Id. at p. 72.

[57] Id. at pp. 72-73.

[58] Id. at p. 75.

[59] Id. at p. 78 and 85.

[60] Id. at p. 84.

[61] Ex. 16 at pp. 43-45; Ex. 18 at pp. 58-59.

[62] Ex. 18 at p. 85.

24, 2002,[63] and denies that her relationship with Ms. Flamm changed as a result of the alleged incident.[64]

## III.    PROCEDURAL HISTORY

Plaintiff initiated this action on June 28, 2002 through the filing of a Complaint against Joshua Sarner, Esquire, Leonard Sarner, Esquire, Sarner & Associates, Jodi H. Brown, M.D., John Matusavage and John Doe Process Server. In her Complaint, plaintiff alleges claims under the federal FDCPA,[65] the CPL;[66] defamation - slander;[67] and civil conspiracy.[68] On November 6, 2002, the Honorable Lowell A. Reed, Jr. dismissed plaintiff's putative claims for intentional infliction of emotional distress.[69]

On January 2, 2003, plaintiff filed a motion seeking to amend her Complaint to add a claim under Pennsylvania Fair Credit Extension Uniformity Act, 73 P.S. § 2270.1 *et seq.* ("FCEUA"), based upon the Sarner defendants' filing of a objection to the discharge of the default judgment in plaintiff's bankruptcy action. On April 7, 2003, this Honorable M. Faith Angell stayed this action, including the pending motion to amend the complaint, until the final resolution of plaintiff's bankruptcy matter, including the resolution of plaintiff's motion for

---

[63] Ex. 16 at p. 82.

[64] Id. at. p. 101.

[65] Ex. 3 at ¶¶ 47-50.

[66] Id. at ¶¶ 51-55.

[67] Id. at ¶¶ 62-65.

[68] Id. at ¶¶ 66-67.

[69] See Ex. 3 at ¶¶ 56-61.

:401841-1

13

sanctions against the Sarner defendants for filing an objection to the discharge of the default judgment.

On February 3, 2004, the Court returned this action to active status following the final resolution of plaintiff's bankruptcy matter and permitted the parties to refile any motions that were pending at the time of the stay. On April 2, 2004, the Court denied plaintiff's motion to amend the Complaint, except as necessary to substitute "John Matusavage" for "John Doe Process Server." On August 12, 2004, plaintiff and Jodi H. Brown, M.D. executed a mutual release and all putative claims against Dr. Brown were dropped.

The parties proceeded to engage in extensive discovery efforts. On February 3, 2005, the Court held a telephonic status conference during which the parties represented to the Court that discovery was complete. On that same date, the Court issued an Order providing the parties until March 7, 2005 to file summary judgment motions. The instant motion is, therefore, timely.

## IV.    **LEGAL STANDARD**

Federal Rule of Civil Procedure56(b) provides that a party against whom a claim has been asserted may, at any time, move for summary judgment. Rule 56 further provides:

> . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . .

Rule 56(c).

## V.    LEGAL ARGUMENT

### A.    The Sarner Defendants Are Not "Debt Collectors" Within The Meaning Of The FDCPA And Cannot Be Held Liable Under That Statute.

The FDCPA is a statute that regulates the conduct of "debt collectors," who are defined as:

> . . . any person who uses any instrumentality of interstate commerce or the mails in any business, the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due to be owed to another. . . . The term does not include:
>
> *            *            *
>
> (D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of a debt.

15 U.S.C. §1692a(6).

The term "regularly" is not defined in the FDCPA statute, but has evolved through judicial interpretation.  In Crossley v. Lieberman, the United States Court of Appeals for the Third Circuit found, based upon a published analysis of the statute, that "any attorney who engaged in the practice of law more than a handful of times per year must comply with the FDCPA."  868 F.2d 566, 569 (3rd Cir. 1989).  Although the defendant attorney in Crossley admitted that the collection of debts was a "principal" part of his legal practice, the Court also analyzed the volume of debt collection litigation filed by the defendant, the number of creditors that defendant represented and the ten-year professional relationship between the defendant and his major creditor client, Fleet.  Id. at 570.

These same factors were considered in Schroyer v. Frankel, where the Sixth Circuit Court of Appeals held that:

. . .for a court to find that an attorney or law firm "regularly" collects debts for purposes of the FDCPA, a plaintiff must show that the attorney or law firm collects debts as a matter of course for its clients or for some clients, or collects debts as a substantial, but not principal, part of its general law practice. Such an interpretation actuates the apparent purpose of Congress in creating attorney liability under the FDCPA: "while attorneys who are considered competitors of traditional debt collection companies should be covered under the Act, a firm whose debt collection activity does not approximate that of a traditional collection agency should not be suable under the act." White [v. Simonson & Cohen, P.C.,] 23 F.Supp.2d [273] at 276 [(E.D.N.Y. 1998)]. In identifying such attorneys, other courts have relied upon a variety of factors, including the volume of the attorney's collection activities, the frequent use of a particular debt collection document or letter, and whether there exists a steady relationship between the attorney and the collection agency or creditor he represented. See e.g. Cacace v. Lucas, 775 F.Supp.2d 504 (D.Conn. 1990). Courts have considered what portion of the overall caseload debt collection cases constitute, and what percentage of revenues derive from debt collection activities. See e.g. Von Schmidt v. Kratter, 9 F.Supp.2d 100, 102 (D.Conn. 1997); Nance [v. Petty, Livingston, Dawson & Devening], 881 F.supp. [223] at 224 [(W.D.Va. 1994)]. Some have maintained that even where debt collection takes up a minor portion of a law practice, "debt collector" liability may lie where the defendant has an "ongoing relationship" with a client whose activities substantially involve debt collection. See Stojanovski [v. Strobl & Manoogian, P.C.], 783 F.Supp. [319] at 322 [(E.D.Mich. 1992)].

197 F.3d 1170,1176 (6th Cir. 1999).

In 2004, the Second Circuit distilled this analysis into seven factors:

> 1)    The absolute number of debt collection communications issued and/or collection-related litigation matters pursued, over the relevant period(s);
>
> 2)    The frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernable;
>
> 3)    Whether the entity has personnel specifically assigned to work on debt collection activity;

4)      Whether the entity has systems or contractors in place to facilitate any such activity;

5)      Whether the activity is undertaken in connection with ongoing client relationships with entities that have retained the lawyer or firm to assist in the collection of outstanding consumer debt obligations;

6)      facts relating to the role debt collection work plays in the practice as a whole should also be considered to the extent that they bear on the regularity of debt collection activity (debt collection constituting 1% of the overall work or revenues of a large entity may, for instance, suggest regularity, whereas work constituting 1% of an individual lawyer's practice might not.) and

7)      Whether the law practice seeks debt collection business by marketing itself as having debt collection expertise may also be an indicator of the regularity of collection as a part of the practice.

Goldstein v. Hutton, 374 F.3d 56, 63 (2nd Cir. 2004).

In this action, plaintiff cannot satisfy her burden of proving that the Sarner defendants "regularly attempt to collect debts alleged to be due another" as alleged in her Complaint.[70] Goldstein, 374 F.3d at 61 (plaintiff burden to establish defendants' debt collector status). Neither Attorney Sarner nor Sarner & Associates practice law in approximation of a debt collection agency presently or during the relevant period.[71] During the 2000-2002 period, the total volume of collections cases opened by Attorney Sarner was six (6) cases for three (3) clients.[72] Four (4) of those cases were for one client, Dr. Brown, who has a total of seven (7) cases over a five year

---

[70] Ex. 3 at ¶ 4.

[71] The statutory period for an FDCPA claim is one year. 15 U.S.C. § 1692k(d). Thus, the only communications at issue in this action are those that occurred between June 27, 2001 and June 28, 2002. Similarly, the "relevant period" for determination of whether the Sarner defendants were "regularly engaged" in "debt collection" activity is the years 2001 and 2002. However, in order to provide the Court with a complete understanding of the paucity of collections activities undertaken by the Sarner defendants, the Sarner defendants have provided data for 1996-2002.

[72] Ex. 1 at ¶ 25.

period.[73]  Collection cases represented 1.3% of Attorney Sarner's personal clients from 2000 to 2002 and an even smaller percentage of the clients of the clients Attorney Sarner serviced as part of his employment with Sarner & Associates.  Neither the volume nor frequency of the Sarner defendants' limited consumer collection practice ever reached a level of "regularity" within the meaning of the FDCPA.

Moreover, the Sarner defendants did not retain staff specifically to handle consumer debt collections.[74]  The Sarner defendants did not represent any collection agencies or other institutions that regularly sought to enforce consumer debts; their biggest collections client was a physician with seven (7) delinquent receivables.  The Sarner defendants do not market themselves as collections attorneys and do not presently accept collections cases.[75]  Thus, as a matter of law, the Sarner defendants cannot be held to have "regularly" engaged in debt collection.  Goldstein, 374 F.3d at 63; Shroyer, 197 F.3d at 1176; and Crossley, 868 F.2d at 569.  For this reason, the Sarner defendants respectfully request that the Court dismiss Count I of the plaintiff's Complaint against them with prejudice.

## B.    The Sarner Defendants Cannot Be Held Liable For The Actions Of Their Independent Contractor, John Matusavage.

The primary claim of this lawsuit is based upon the allegation that John Matusavage acted improperly when serving the Notice of January 24, 2005.[76]  Plaintiff has alleged that Mr. Matusavage was a "debt collector" employed by the Sarner defendants[77] and has implicitly

---

[73] Id. at ¶¶ 26-28.

[74] Ex. 2 at p. 157.

[75] Ex. 1 at ¶ 12; Ex. 2 at pp. 86-91, 157-158

[76] Id. at ¶¶ 26-46. 49, 55, 63-64, 67.

[77] Ex. 3 at ¶ 10, ¶ 12 and ¶ 15.

:401841-1

18

alleged that the Sarner defendants were responsible for his actions under the doctrine of respondeat superior. However, Mr. Matusavage was not an employee of the Sarner defendants, but an independent contractor. As a matter of law, the Sarner defendants cannot be held responsible for the actions of Mr. Matusavage and all claims against the Sarner defendants based upon Mr. Matusavage's alleged conduct should be dismissed.

A principal may only be held liable for the actions of its agent if the agent can be characterized as a "servant" of the principal. Moon Area School District v. Garzony, 560 A.2d 1361, 1367 (Pa. 1989)(concept of "servant" may be contrasted with concept of "independent contractor" while an "agent" may be applied to either relationship); Myszowski v. Penn Stroud Hotel, Inc., 634 A.2d 622, 625 (Pa.Super. 1993)("not every relationship of principal and agent creates vicarious liability in the principal for the acts of the agent . . . If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent."); Lutz v. Cybularz, 607 A.2d 1089, 1091 (Pa.Super. 1992). Under Pennsylvania law, "[t]he hallmark of an employee-employer relationship is that the employer not only controls the result of the work but has the right to direct the manner in which the work shall be accomplished; the hallmark of the independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result." Myszowski, 634 A.2d at 626 (quoting Green v. Independent Oil Co., 201 A.2d 207, 210 (Pa. 1964)).

In addition, the Pennsylvania Courts have considered other, more specific, factors as characterizing the independent contractor's relationship, including: the nature of the work; the skill required for its performance; whether the employment involves a distinct occupation or business; who provides the tools used in the employment; whether the work is part of the regular

business of the employer; and the right to terminate the employment at any time. <u>Valles v.</u> <u>Albert Einstein Medical Center</u>, 758 A.2d 1238, 1244 (Pa.Super. 2000). When the facts of the relationship between two parties are not in dispute, the Court may determine whether a party may be characterized as an independent contractor as a matter of law. <u>Lutz</u>, 607 A.2d at 1091.

In the case *sub judice*, it has been clearly established that Mr. Matusavage was not a "servant" of the Sarner defendants. From approximately 1988 to the present, Mr. Matusavage has operated his own subpoena service business.[78] He operates his business from his home and pays for his own expenses and supplies.[79] Mr. Matusavage charges a flat fee for his service which he himself establishes.[80] Mr. Matusavage was provided with an envelope, a name and an address and was paid based solely upon the result - effecting service.[81] Mr. Matusavage has testified that the Sarner defendants did not control the manner in which service was made and did not provide Mr. Matusavage with resources to complete the assigned task:

> Q. . . . Did Sarner & Associates ever give you an office?
>
> A. No.
>
> Q. Did they ever give you health insurance?
>
> A. No.
>
> Q. Did they ever give you a pension plan?
>
> A. No.
>
> Q. Did Sarner & Associates ever allow you to pay into a 401K plan?

---

[78] Ex. 7 at p. 13.

[79] <u>Id</u>. at pp. 15-17.

[80] <u>Id</u>. at p. 22.

[81] <u>Id</u>. at pp. 72-73.

A.    No.

Q.    Did you ever ask Sarner & Associates for any of these things?

A.    No.

Q.    Why didn't you?

A.    Because I have nothing to do with Sarner & Associates. I'm not an employee of them.  I have no business dealings with them other than he called me.  I did what he needed to have done and that was it.

Ex. 7 at pp. 41-42.

There is no factual basis upon which to assert that Mr. Matusavage was anything more than an independent contractor of the Sarner defendants who was retained for the limited purpose of serving process.  Although the Pennsylvania courts have not addressed the issue, courts in other jurisdictions have determined that a law firm's retention of a private process server does not give rise to vicarious liability.  Kersten v. Van Grack, Axelson & Williamowsky, P.C., 608 A.2d 1270, (Ct..App. Md. 1992)(process server under contract with law firm not an employee; law firm not responsible for fraud allegedly perpetrated by server's falsification of service receipt); Bockian v. Esanu, Katsky & Siger, 476 N.Y.S.2d 1009 (NYSup. 1984)(plaintiff could not set forth cause of action against law firm for alleged assault, harassment and interference with business purportedly caused by process server).  Mr. Matusavage cannot be characterized as an "employee" or "servant" of the Sarner defendants and each of plaintiff's putative claims arising from Mr. Matusavage's alleged acts[82] should be dismissed against the Sarner defendants accordingly.

---

[82] See Ex. 3 at ¶ 49 (b), (c), (e), (f), (g), and (h); ¶ 55(a), (b); ¶¶ 63-65; ¶¶ 67-74.

**C.     The Sarner Defendants Cannot Be Held Liable Under
The FDCPA For The Service Of Legal Process Alone.**

Plaintiff alleges that attempting to serve process upon her, regardless of what was purportedly said by Mr. Matusavage,[83] was improper under the FDCPA and CPL.[84]  While the Sarner defendants do not believe that the FDCPA applies to their limited collection litigation activities, even if it did, they cannot be held liable under the FDCPA based solely upon the service of process.  The FDCPA's definition of "debt collector" is clearly defined by the statute, and specifically excludes:

> (D)  any person while serving or attempting to serve <u>legal process</u> on any other person in connection with the judicial enforcement of any debt. . .

15 U.S.C. § 1692a(6)(D) (emphasis added).

Pennsylvania Rule of Civil Procedure 3117 provides a party with the full benefit of all discovery procedures available in litigation under Pennsylvania law.  <u>Paine Webber, Inc. v. Devin</u>, 658 A.2d 409, 413 (Pa. Super 1995).  Under Pennsylvania law, discovery requests generally constitute "legal process."  <u>See</u> <u>Rosen v. American Bank of Rolla</u>, 627 A.2d 190, 192 (Pa. Super. 1995).  The Pennsylvania Supreme Court has specifically held that process to enforce

---

[83] As set forth in Argument B above, the Sarner defendants cannot be held liable for the actions of Mr. Matusavage.

[84] Ex. 3 at ¶ 49(a)("Contacting Plaintiff's employer, a third party, without prior consent."); ¶ 49(d) ("Attempting to contact Plaintiff at her place of employment after Defendants knew she was represented by attorney Robert P. Brand, Esquire."); ¶ 55(c) ("Attempting to contact Plaintiff at her place of employment after Defendants knew she was represented by attorney Robert P. Brand, Esquire."). Plaintiff's putative CPL claim is addressed at length in argument D, but defendants assert that the CPL was not enacted as a means to permit a party to avoid service of process as permitted under Pennsylvania Rule of Civil Procedure 440(a)(2)(a).

Defendants assert that Mr. Brand did not identify himself as counsel to Ms. Flamm until March 25, 2002. <u>See</u> Ex. 17 ("Please be advised that I have been retained by Mara Flamm . . . "); <u>see also</u> Ex. 2 at pp. 43-45.  However, this dispute of fact does not effect the outcome of the legal argument of whether the FDCPA permits suits based upon allegedly improper service of process.

compliance with post-judgment discovery is not merely a ministerial order that may be issued by

the Prothonotary or an administrative body, but <u>must</u> be issued by the Court.  See <u>Hanchey v.</u>

<u>Elliot Truck Brokerage Company, Inc.</u>, 218 A.2d 743 (Pa. 1966).

Under Pennsylvania law, papers other than original process may be served as follows:

> (2)(i)  If there is no attorney of record, service shall be made by
> handing a copy to the party or by mailing a copy to or leaving a
> copy for the party at the address endorsed on an appearance or
> prior pleading or the residence or place of business of a party.

Pennsylvania Rule of Civil Procedure 440(a)(2)(a).

In this action, the plaintiff admits that:

> 16.   On or about February 20, 2001, Defendant Brown filed a
> Statement of Claim against Plaintiff in the Municipal Court of
> Philadelphia alleging that Plaintiff owed her $5,000.

> 17.   On or about April 4, 2001, the Municipal Court entered a
> default judgment in favor of Defendant Brown and against Plaintiff
> in the amount of $6,215 plus $ 65 in costs.

> 18.   At all material times, Peirce College employed Plaintiff.

> 19.   On or about October 26, 2001, Defendant John
> Matusavage, an employee, agent and/or representative of
> Defendant Sarner & Associates, P.C., served a Notice of
> Deposition in Aid of Execution ("Notice") at Peirce College in
> Philadelphia by leaving a copy of the Notice of Deposition in Aid
> of Execution ("Notice") at Peirce College in Philadelphia,
> Pennsylvania by leaving a copy of the Notice with Plaintiff's
> supervisor.

> *          *          *

> 23.   On or about January 22, 2002, Plaintiff filed a Voluntary
> Petition under Chapter 7 of the Bankruptcy Code.

> 24.   On January 25, 2002, John Doe Process Server appeared at
> Plaintiff's place of employment without permission ...

> *          *          *

:401841-1

23

27.     John Doe Process Server then asked Rutling if she would accept a package for Plaintiff.

Complaint at ¶¶s 16-19, 23, 24 and 27 (Ex. 3).

Discounting the alleged (and denied) conduct of Mr. Matusavage, which cannot be vicariously attributed to the Sarner defendants, the only remaining activity forming the basis of the Complaint is the service of the Rule on January 24, 2002. The Rule issued under Pa.R.Civ.P. 3117 constitute "legal process." The service of legal process is specifically excepted from the activity regulated by the FDCPA, and cannot form the basis of a private legal action under the FDCPA. Any other result would provide debtors with a means to avoid service of process as permitted under the Pennsylvania Rules of Civil Procedure. Accordingly, the attorney defendants respectfully request that this Court dismiss Count I from the plaintiff's Complaint with prejudice.

### D.     Plaintiff Cannot Set forth A Cause Of Action Under The CPL In The Absence Of Ascertainable Damages To Money Or Property.

The CPL does not permit a party to recover for the emotional damages in the absence of tangible damage to real property or personal property. 73 P.S. § 2270.5(a); 73 P.S. § 201-9.2(a). Specifically, the CPL provides:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney's fees.

73 P.S. § 201-9.2(a)(emphasis added).[85]

The Pennsylvania Supreme Court has held that "[t]he [CPL] statute clearly requires, in a private action that a plaintiff suffer an ascertainable loss <u>as a result of</u> the defendants' prohibited action." <u>Weinberg v. Sun Co., Inc.,</u> 777 A.2d 442, 446 (Pa. 2001)(emphasis in original); The "ascertainable loss" provision of the CPL has consistently been found to require the claimant to demonstrate that "ascertainable" damages were proximately caused by the defendants' alleged conduct. <u>Yocca v. Pittsburgh Steelers Sports, Inc.,</u> 854 A.2d 425, 438 (July 20, 2004)(plaintiffs must demonstrate reliance resulting in ascertainable damages in order to set forth a claim under the CPL); <u>Aronson v. Greenmountain.com.,</u> 809 A.2d 399, 405 (Pa. Super 2002); <u>Parks, et al. v. Portnoff Law Associates, Ltd.,</u> 210 F.R.D. 146, 151 (E.D. Pa. 2002)(class certification under the CPL denied where plaintiffs failed to show that proposed class members individually sustained actual damages); <u>Krisa v. Equitable Life Assurance Society,</u> 109 F.Supp.2d 316, at n. 5 (M.D.Pa.

---

[85] In contrast, the FDCPA does not require proof of actual damages, but limits the liability of a "debt collectors" as follows:

> Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of –
>
> **(1)** any actual damage sustained by such person as a result of such failure;
>
> **(2)(A)** in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or
>
>       \*        \*        \*
>
> **(3)** in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court. On a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs.

15 U.S.C. § 1692k(a).

1999)(actual or ascertainable damages required for recovery under CPL); In re: Derienzo, 254 B.R. 334 (M.D. Pa. 2000)(CPL did not provide cause of action arising from issuance of credit card "to induce purchases of goods" absent proof of actual loss); In re: Andrews, 78 B.R. 78 (E.D.Pa. 1987)(plaintiff held to trebled "actual damages" despite clear finding of gross violation of consumer protection laws); In re: Jungkurth, 74 B.R. 323 (E.D.Pa. 1987)(plaintiff barred from recovery of award for failure to prove actual damages, though Court struck remaining unconscionable loan obligation as "recoupment").

In this action, plaintiff admits that she has not experienced any an "ascertainable loss of money or property,"[86] but purports only to have suffered "nervousness."[87] Plaintiff received no medical treatment for her alleged nervousness other than acupuncture.[88] Plaintiff has not produced any bills for her purported acupuncture treatments or the dates that such treatments allegedly occurred. Even if plaintiff could produce acupuncture receipts, it is impossible to determine the extent to the treatments were necessary to alleve stress that plaintiff was experiencing from her first pregnancy or her teaching or some combination of the two. In the absence of an ascertainable loss of money or property proximately caused by the Sarner defendants,[89] plaintiff cannot set forth a claim under the CPL. The Sarner defendants

---

[86] Id. at p. 75.

[87] Ex. 3 at ¶ 42 and ¶ 43; Ex. 18 at pp. 68-69.

[88] Id. at pp. 72-73.

[89] Plaintiff has alleged that her "nervousness" was caused by her worry that Mr. Matusavage would return and make improper comments to her supervisors at Pierce College. Ex. 18 at pp. 68-69. Thus, plaintiff's alleged damages are not purported to have been proximately caused by the Sarner defendants, but by the alleged (and denied) actions of Mr. Matusavage. As set forth in Argument B above, Mr. Matusavage's actions cannot be attributed to the Sarner defendants and do not give rise to vicarious liability. Therefore, even if plaintiff's "nervousness" can constitute an "ascertainable loss of money or property" (which is denied), plaintiff's putative claim is against Mr. Matusavage alone. Yocca, 854 A.2d at 438; Aronson, 809 A.2d at 405.

respectfully request that the Court dismiss Count II of the plaintiff's Complaint against them accordingly.

### E.  Plaintiff Cannot Set Forth A Claim Of Defamation In The Absence Of Damage To Plaintiff's Reputation.

In order to state a claim for defamation, a plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to plaintiff; (6) special harm resulting from the publication; (7) abuse of a conditionally privileged occasion. 42 Pa.C.S.A. § 8343; Rush v. Philadelphia Newspaper, Inc., 1999 Pa. Super. 141, 1999 Pa. Super. LEXIS 1805 (1999). In an action for defamation, the court must initially determine whether the communication as issue is capable of defamatory meaning. Baker v. Lafayette College, 516 Pa. 291, 532 A.2d 399, 402 (1987), Maier v. Maretti, 671 A.2d 701,704 (Pa. Super. 1995). If a speaker "imputes to another conduct, characteristics, or a condition that would adversely affect her in her lawful business or trade" then the oral communication may be termed "slander *per se*." Walker v. Grand Cent. Sanitation, Inc., 634 A.2d 237, 241 (Pa.Super. 1993).

In cases of slander *per se*, a claimant is permitted to recover without proof of special damages. Walker, 634 A.2d at 242. The claimant is not, however, relieved of the burden of proving general damages:

> We are convinced, and therefore hold, that Section 621 of the Restatement (Second) of Torts accurately states the law of Pennsylvania with regard to damages in cases of slander *per se*. Namely, a defendant who publishes a statement which can be considered slander *per se* is liable for the proven, actual harm the publication causes. This is consistent with our Supreme Court's

tendency to adopt the Second Restatement of Torts in defamation matters. [citation omitted].

Walker, 634 A.2d at 244; accord Franklin Prescriptions, Inc. v. The New York Times Co., 2004 U.S.Dist. LEXIS 15342 at *28, n.34 (E.D.Pa. 2004)(collecting case law holding general damages requirement for claims of slander *per se*).

The Walker case involved oral statements made by a employer about a former employee's job performance. 634 A.2d at 239. The prospective employer did not give credence to the former employer's statements and testified that his opinion of the employee was not changed. Id. Based upon the plaintiff's failure to set forth general damages, the Pennsylvania Superior Court reversed a jury verdict in favor of the employee, and held:

> Here it becomes clear upon reviewing the record that the jury was not presented with evidence upon which it could base an award of damages, even if it could have found that Perin was not privileged to make the statements he did. The defamatory statement was spoken to one person, Tolbert, so that he could evaluate Walker and develop a marketing team for a venture that never transpired. Tolbert testified that he thought no less of Walker personally and that his opinion of her capabilities was unaffected by the defamation. There is no evidence that the words were repeated to anyone other than Tolbert or that they had an adverse effect on her job search. Walker did not testify that she suffered any adverse emotional reaction or that they impeded her ability to gain employment. These circumstances cannot, under Pennsylvania law, permit recovery for a slander *per se*.

Walker, 634 A.2d at 244-245.

The instant case is directly on point with Walker, in that Mr. Matusavage's alleged statements were made to a single person, Ms. Rutling, who testified that she did not believe them and that the statements did not alter her opinion of Ms. Flamm.[90] Moreover, plaintiff herself has admitted that her job performance was not impaired by her alleged nervousness,[91] that her

---

[90] Ex. 16 at pp. 61-63, 78, 101.

[91] Id. at p. 78 and 85.

:401841-1

28

reputation at Pierce remained favorable and the only person with any knowledge of Mr. Matusavage's alleged statements is Ms. Rutling.[92]  In the absence of general damages, plaintiff cannot set forth a claim in defamation against the Sarner defendants (or, for that matter, Mr. Matusavage).  Walker, 634 A.2d at 244-245.  For this reason, the Sarner defendants respectfully request that the Court dismiss Count IV of the plaintiff's Complaint against them with prejudice.

**F.    Plaintiff Cannot Set Forth A Claim For Conspiracy In The Absence Of An Agreement Between The Parties To Commit An Unlawful Act.**

In order to state a cause of action for civil conspiracy, a plaintiff must show that two or more persons intentionally entered into an agreement to do an unlawful act or to do an otherwise lawful act by unlawful means.[93]  Skipworth v. Lead Industries Ass'n., Inc., 690 A.2d 169, 174 (Pa. 1997), citing, Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 472-3, (Pa. 1977); Rutherford v. Presbyterian-University Hospital, 612 A.2d 500, 508 (Pa. Super. 1992).  "Bald accusations of a conspiracy" without sufficient material facts are insufficient to set forth a civil conspiracy claim.  Thompson, 412 A.2d at 473.

Setting aside the factual disputes concerning what Mr. Matusavage did or did not say to Ms. Rutling, plaintiff is unable to prove that the Sarner defendants entered into an agreement with Mr. Matusavage to perform an illegal act.  Both Attorney Sarner and Mr. Matusavage deny plaintiff's allegation that Attorney Sarner directed Mr. Matusavage to intimidate Ms. Flamm or her co-workers.[94]  There is no factual evidence that Attorney Sarner and Mr. Matusavage entered

---

[92] Id. at p. 84.

[93] An agreement without an illegal act (or attempted illegal act) is not actionable. Skipworth, 690 A.2d at 174; Rutherford, 612 A.2d at 508. To the extent that the Court dismisses the plaintiff's other putative claims, plaintiff's purported conspiracy claim must also be dismissed.

[94] Ex. 2 at pp. 145-146; Ex. 7 at pp. 60-61.

:401841-1

29

into an agreement to defame or intimidate Ms. Flamm. Even if the fact finder determines that Mr. Matusavage made improper comments to Ms. Rutling (which is denied), there is no basis to find that Attorney Sarner directed Mr. Matusavage to make such comments. In the absence of an agreement between Attorney Sarner and Mr. Matusavage, the Sarner defendants (and Mr. Matusavage) cannot be found liable for conspiracy and therefore respectfully request that the Court dismiss Count V of plaintiff's Complaint against them with prejudice.

## VI.    CONCLUSION

The Sarner defendants do not regularly conduct debt collection activities within the meaning of the FDCPA and cannot be held liable under that statute. The Sarner defendants also do not, and have not, employed Mr. Matusavage as anything other than an independent contractor, and cannot be held vicariously liable for his alleged (and denied) actions under any theory of law. Even if the FDCPA did apply to the Sarner defendants' practice of law, their only affirmative act was to effect service of process, which is not an actionable under the FDCPA. Plaintiff's putative CPL claim is also not cognizable because plaintiff is not alleged to have suffered "an ascertainable loss of money or property, only "nervousness." Plaintiff's lack of damages also precludes recovery under a theory of defamation *per se*, which requires plaintiff to prove some general harm to her reputation. Lastly, plaintiff cannot recover under a conspiracy theory without proof of an agreement between the parties to commit an unlawful act.

:401841-1

For these reasons, the Sarner defendants respectfully request that the Court dismiss plaintiff's Complaint against them with prejudice.

Respectfully submitted,

CHRISTIE, PABARUE, MORTENSEN and YOUNG
A Professional Corporation

By: _____

JAMES W. CHRISTIE (I.D. No. 12068)
WILLIAM F. MCDEVITT (I.D. No.: 80206)
Attorneys for Defendants Sarner & Associates, P.C.;
Joshua Sarner, Esquire and Leonard Sarner, Esquire
("Attorney Defendants")

Dated: 3/7/05

:401841-1

31