EXHIBIT 1

CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARA FLAMM, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 02-4302 |
| v. | : | |
| | : | |
| SARNER & ASSOCIATES, P.C. and | : | |
| JOSHUA SARNER, ESQUIRE and | : | |
| LEONARD SARNER, ESQUIRE and | : | |
| JODI H. BROWN, M.D. and JOHN | : | |
| MATUSAVAGE, | : | |
| | : | |
| Defendants. | : | |

### AFFIDAVIT OF JOSHUA SARNER, ESQUIRE

I, Joshua Sarner, Esquire, being duly sworn according to law do hereby state that the following is true and correct to the best of my knowledge, information and belief:

1.     I am an attorney licensed to practice law in the Commonwealth of Pennsylvania, and was so licensed during all times relevant hereto. I have personal knowledge of the matters set forth in this affidavit.

2.     I am the Vice-President and Secretary of co-defendant Sarner & Associates, P.C., located at 11 Penn Center, 29th Floor, Philadelphia, Pennsylvania.

3.     The founder and President of Sarner & Associates, P.C., is my father, Leonard Sarner, Esquire.

4.     At the time I joined Sarner & Associates in July of 1996, Leonard Sarner had an extensive corporate and tax practice, and, to the best of my knowledge, none of such practice involved the collection of debts from individuals.

:452530-1

CONFIDENTIAL

5.    Likewise, during the period from 1996 through 2002, my father did no such collection work as well.

6.    Leonard Sarner, Esquire, is currently 87 years old, and on or about August 4, 2004, suffered a fall, requiring numerous stitches to his head. He is currently in rehabilitation, and is unable to provide an affidavit in this matter. Nevertheless, I am sufficiently familiar with his practice to make the statements contained herein.

7.    I practice law solely through Sarner & Associates, P.C. and do not maintain a separate practice apart from my employment with the firm.

8.    The terms "collection cases," "collection files" and/or "collection matters" as used in this affidavit include both litigation matters and matters that involve only the mailing of letters.

9.    In my law practice, I handle cases concerning: Tax Litigation, Corporate Litigation, White Collar Criminal Defense, Criminal Law, Probate Litigation, and General Corporate Representation.

10.    The practice of Sarner & Associates, P.C. also includes International Business Law and Litigation, Estate Planning, Real Estate Law and Criminal Law.

11.    Neither I nor Sarner & Associates, P.C. regularly practice collections law.

12.    Neither I nor Sarner & Associates, P.C. advertise or otherwise solicit business as specializing or representing clients in collections matters, except that I personally am on the list of attorneys maintained by the Philadelphia Bar Association Lawyer Referral Service available to accept cases in the area of collections.

13.    I have undertaken a review of the case files, case file summaries, fee income reports, and tax returns of Sarner & Associates, P.C. for the years 1996 through 2002 in order to

:452530-1

CONFIDENTIAL

determine the number of clients that Sarner & Associates, P.C. represented in matters seeking the repayment of monies owed by individuals, and the income generated therefrom and in the practice in its entirety.

14.    From the period of my start at Sarner & Associates in July of 1996, through the end of 1997, my records indicate that I opened and worked on 41 files, for 32 separate clients.

15.    None of these matters concerned the collection of debts from individuals.

16.    During the years 1998 and 1999, my records indicate that I opened and worked on 111 files, for 89 separate clients.

17.    Only three (3) of those files were collection cases against individuals and were all

REDACTED PER RULE 5.1.3

18.    Other than those three (3) cases for the one client, Dr. Brown, I neither opened nor worked on other collection matters against individuals during this time period.

19.    My total fee from Dr. Brown for these three cases during the years 1998 and 1999 was $1,827.00.

20.    The approximate total fee that I generated at Sarner & Associates during the years 1998 and 1999, not counting the revenue that I generated through work on cases brought to the firm by Leonard Sarner, Esquire, _REDACTED_ Stated otherwise, this _REDACTED_ represents revenue I generated for the firm as a "rainmaker."

21.    Sarner & Associates does not maintain a summary record of the revenue that I personally generated in 1998 and 1999 through my work for the existing clients brought to the firm by Leonard Sarner, Esquire.

CONFIDENTIAL

22.    Paragraph 20 above understates the total amount of revenue that I generated for the firm in the years 1998 and 1999, because: a) the firm's largest client, for which I do substantial work, is "flat-billed"; and b) no record exists summarizing my billings for the firm's existing "hourly" clients brought in by Leonard Sarner, Esquire.

23.    The approximate total fee generated by Sarner & Associates during the years 1998 and 1999 was in excess of REDACTED

24.    During the years 2000, 2001 and 2002, my records indicate that I opened and worked on 162 files for 135 separate clients.

25.    Only six (6) of those files were collection matters against individuals for three (3) clients.

26.    Four (4) of those collections cases were for Dr. Brown, namely, Brown v. Dezzi, Brown v. Kowalak, Brown v. Manno, and Brown v. McPeat.

27.    My client in the fifth case was the REDACTED in an action against Timothy Howley.

28.    My client in the sixth case was Rhonda Gallagher in an action against a Mr. Kyle.

29.    My total fees from Dr. Brown for these and the prior cases during 2000, 2001, and 2002 was REDACTED

30.    My total fee for Rhonda Gallagher was REDACTED

31.    My total fee for the Estate of Joseph Fisicaro was REDACTED

32.    The approximate total fee that I generated at Sarner & Associates during the years 2000, 2001 and 2002, not counting the revenue that I generated through work on cases brought to the firm by Leonard Sarner, Esquire, was REDACTED Stated otherwise, this REDACTED represents revenue I generated for the firm as a "rainmaker."

:452530-1

CONFIDENTIAL

33.    Sarner & Associates does not maintain a summary record of the revenue that I personally generated in 2000, 2001 and 2002, through my work for the existing clients brought to the firm by Leonard Sarner, Esquire.

34.    Paragraph 32 above understates the total amount of revenue that I generated for the firm in the years 2000, 2001 and 2002, because: a) the firm's largest client, for which I do substantial work, is "flat-billed"; and b) no record exists summarizing my billings for the firm's existing "hourly" clients brought in by Leonard Sarner, Esquire.

35.    The approximate total fee generated by Sarner & Associates during the years 2000, 2001 and 2002 was in excess of: REDACTED

36.    Dr. Brown is a psychiatrist who retained Sarner & Associates, P.C. to pursue a small number of collections matters against her former patients (including plaintiff Mara Flamm) who did not pay Dr. Brown monies owed for medical treatment provided to them.

37.    Since 1996, Dr. Brown has been a personal friend of mine.

38.    Each of the other clients retained Sarner & Associates to litigate single cases involving monies owed by individuals, which debts may or may not have arisen from obligations incurred for personal, family or household purposes.

39.    Other than attending the scheduled deposition of Mara Flamm in the underlying matter (which deposition did not occur due to plaintiff's failure to appear), Leonard Sarner, Esquire was not involved in the provision of services to the clients who retained Sarner & Associates, P.C. in collections matters from 1996 through 2002.

:452530-1

CONFIDENTIAL

40.    From 1998 to 2002, collections cases represented 9 of the 273 cases that I personally opened and worked on at Sarner & Associates, or 3.2% of the cases that I opened and worked on during that period.

41.    From 1998 to 2002, collections cases represented 4 of the 224 clients that I personally represented at Sarner & Associates or 1.7% of all clients that I personally represented during that period.

42.    From 1998 to 2002, collections cases represented        ، of the              in revenues that I individually generated at Sarner & Associates as a "rainmaker," or 3% of the revenues that I personally generated as a "rainmaker" during that period.

43.    From 1998 to 2002, collections cases represented $4,833 of the more than $1,500,000 in total revenue generated by the firm of Sarner & Associates or approximately 0.3% of the total revenue of Sarner & Associates generated during that period.

I certify that the foregoing statements made by me are true to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment under federal law.

_____  8/12/04
JOSHUA SARNER, ESQUIRE

:452530-1

EXHIBIT 2

1

```
 1       IN THE UNITED STATES DISTRICT COURT

 2     FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                   -   -   -

 4   MARA FLAMM,        :   CIVIL ACTION
          Plaintiff,   :
 5                      :
          V.            :
 6                      :
     SARNER & ASSOCIATES,:
 7   P.C., et al.,      :
          Defendants.  :  NO. 02-4302
 8                   -   -   -

 9             November 17, 2004

10                CONFIDENTIAL

11                   -   -   -

12             Oral deposition of JOSHUA

13   SARNER, held in the offices of Christie

14   Pabarue Mortensen & Young, P.C., 1880 JFK

15   Boulevard, 10th Floor, Philadelphia,

16   Pennsylvania 19103 commencing at 10:11

17   a.m., on the above date, before Linda

18   Rossi Rios, a Federally Approved

19   Registered Professional Reporter and

20   Notary Public of the Commonwealth of

21   Pennsylvania.
                   -   -   -
22          ESQUIRE DEPOSITION SERVICES
          1880 John F. Kennedy Boulevard
23                15th Floor
          Philadelphia, Pennsylvania 19103
24              (215) 988-9191
```

ESQUIRE DEPOSITION SERVICES

7

```
 1          A.    Yes.

 2          Q.    And have you conducted

 3   depositions before?

 4          A.    I have.

 5          Q.    Do you have any objections

 6   of my dispensing with the ordinary

 7   instructions that accompany a deposition?

 8          A.    It's not my place to make

 9   objections, my counsel makes objections.

10          Q.    But to the extent I need to

11   instruct you to answer out loud, or if

12   you don't understand the question I'll be

13   happy to rephrase it, any other -- do you

14   understand those instructions?

15          A.    I understand those two

16   instructions you just gave me, yes.

17          Q.    Can we start with your

18   professional history starting with law

19   school?

20          A.    I went to law school at the

21   University of Pennsylvania.  I earned my

22   J.D. in May of 1988.  I had clerked in

23   the Philadelphia Municipal Court for the

24   Honorable William Brady in the summer of
```

ESQUIRE DEPOSITION SERVICES

8

```
 1    1986.  In the summer of 1987, I had
 2    clerked -- I had summer associated at the
 3    law firm of Duane Morris.  Commencing in
 4    February of 1988 through the end of the
 5    calendar year, 1988, I had a judicial
 6    clerkship with the Honorable Juanita Kidd
 7    Stout of the Pennsylvania Supreme Court.
 8    And I commenced practicing full time at
 9    Duane Morris in January of 1989.
10         Q.    What has been your
11    professional experience since 1989?
12         A.    Since 1989, I was at Duane
13    Morris & Heckscher until the end of
14    July -- I'm sorry, excuse me, until the
15    end of June of 1996 at which time I
16    became a shareholder in Sarner &
17    Associates.
18         Q.    And did you have an area of
19    concentration during your years at Duane
20    Morris?
21         A.    I did.
22         Q.    What was that area of
23    concentration?
24         A.    I was in a litigation
```

1    department that was known -- had several

2    names.  It was known either as the

3    criminal litigation group, the tax

4    litigation group or the special

5    litigation group depending on who you

6    asked.

7           Q.    Did any of your experience

8    during those years involve any debt

9    collection activities?

10          A.    Not that I recall.

11          Q.    You became a shareholder in

12    Sarner & Associates in 1996?

13          A.    That's correct.

14          Q.    And are you still a

15    shareholder in Sarner & Associates?

16          A.    I am.

17          Q.    And Sarner & Associates is

18    your current employer?

19          A.    That's correct.

20          Q.    As of today, what are your

21    areas of concentration at Sarner &

22    Associates?

23          A.    My practice has changed

24    significantly within the last, I would

26

1    Deposition?

2         A.    I don't recall whether I had

3    mailed it to the Shell Street address or

4    by that time whether I knew -- had known

5    that she was working at Peirce College.

6    So I either mailed it to the Shell Street

7    address or I had it served at Peirce

8    College.

9         Q.    When did you first meet John

10   Matusavage?  First of all, do you know

11   who John Matusavage is?

12        A.    I do.

13        Q.    How did you first meet John

14   Matusavage?

15        A.    I recall receiving a cold

16   contact from Mr. Matusavage, and I don't

17   recall specifically whether it was in the

18   nature of a written solicitation or it

19   might have even been a telephone call.

20   But I was contacted by Mr. Matusavage

21   right around the time when I needed

22   someone to serve a document in this case.

23   So I met him shortly after that.

24        Q.    Prior to your engagement,

27

```
 1    I'm going to call him John if that's okay

 2    because I'm going to butcher his name.

 3         A.    That's fine.

 4         Q.    Prior to your engagement of

 5    John, had you had a process server that

 6    you used on a regular basis?

 7         A.    No.

 8         Q.    With regard to the Notice of

 9    Deposition, do the Rules of Civil

10    Procedure and/or the local Municipal

11    Court rules require that that notice be

12    served personally or can it be served by

13    mail?

14              MR. GRAF:  Objection.

15              MR. McDEVITT:  Objection.

16         Are you asking him what he

17         understood at the time or are you

18         asking him to give --

19              MR. MESTER:  What he

20         understood at the time as to

21         requirements for the service of

22         the Notice of Deposition.

23              MR. McDEVITT:  Take a break

24         for a second.
```

ESQUIRE DEPOSITION SERVICES

28

```
 1                   -  -  -

 2              (Interruption.)

 3                   -  -  -

 4              THE WITNESS:  Would you

 5         repeat the question?

 6   BY MR. MESTER:

 7         Q.    At the time that you were

 8   serving the Notice of Deposition -- I'll

 9   ask it this way:  What was your

10   understanding of the service requirements

11   at the time you sent that Notice of

12   Deposition?

13         A.    The requirements for serving

14   the Notice of Deposition where a party

15   has entered and appeared in a lawsuit is

16   to either mail a copy of it to their

17   counsel, if counsel is of record, or to

18   mail a copy of it to them if they have no

19   counsel.  In this case, there was no

20   appearance, there was no communication.

21   I had no idea how to actually contact Ms.

22   Flamm.  And so I believe that out of an

23   abudance of caution, because I wanted to

24   make sure that she got the notice, I had
```

29

 1    it served probably both by mail at her

 2    Shell Street house and also at Peirce

 3    College.

 4          Q.    And do you agree that John

 5    served or attempted to serve the Notice

 6    of Deposition upon Mara at Peirce College

 7    on October 26, 2001?

 8          A.    Other than your use of the

 9    word "attempted," I would agree.   In

10    other words, I think he actually did, in

11    fact, serve that at Peirce College.

12          Q.    And how did you determine

13    that Mara worked at Peirce College?

14          A.    I did an Internet search.

15          Q.    Do you know whether or not

16    John attempted to serve the Notice of

17    Deposition at the Shell Street address?

18          A.    I do.

19          Q.    And what was the result of

20    his efforts to serve her at the Shell

21    Street address?

22          A.    He was unsuccessful.   He was

23    convinced -- I'll just say that.   He was

24    unsuccessful.

ESQUIRE DEPOSITION SERVICES

1        Q.    With regard to the Notice of

2    Deposition that was served on October 26,

3    2001, in what manner did you provide John

4    with that document?

5              MR. McDEVITT:  Objection.

6              MR. MESTER:  Let me strike

7         the question.

8    BY MR. MESTER:

9        Q.    When you gave the Notice of

10   Deposition to John, was it in an

11   envelope?

12       A.    I don't recall.  I believe

13   that he came by my office and picked up

14   documents to serve.  And so it may have

15   been in an envelope or it may have just

16   been the actual document and I handed it

17   to him.  I don't recall.

18       Q.    And when you handed him the

19   document, was that the first time you met

20   John face to face?

21       A.    No.

22             MR. McDEVITT:  Object --

23        okay.  Just objecting to the form.

24        But go ahead.

ESQUIRE DEPOSITION SERVICES

50

```
 1    Rules of Civil Procedure?
 2         A.    No.
 3         Q.    Why not?
 4         A.    He was not counsel of
 5    record.  You can ask an attorney to
 6    accept a document, but the attorney has
 7    to be of record.
 8         Q.    With regard to the Notice of
 9    Deposition, did you ever petition or move
10    the Municipal Court for alternative
11    service by posting?
12         A.    No.
13         Q.    Why not?
14         A.    I had an address where I
15    knew Mara Flamm could be located.  And I
16    had actually served a document on her,
17    without objection, by Mr. -- by John
18    earlier in the year, and so I was under
19    the impression that that was a perfectly
20    fine, nonobjectionable means of serving
21    process on her.
22         Q.    I want to move to the
23    January 25, 2002 service.  What document
24    did you provide to John for service on or
```

51

1    about January 25, 2002?

2         A.    As I sit here, I'm not

3    entirely clear.  I think perhaps after

4    she had not shown up at the original

5    deposition, I may have moved for a rule

6    to show cause which I believe was

7    granted.  And so I think it was -- I

8    think it was a rule to show cause to show

9    up at a deposition or face sanctions.  I

10   believe that's what it was.

11        Q.    And did you provide the

12   petition and rule to show cause to John

13   for service for purposes of service?

14        A.    Whatever the document was, I

15   gave it to him, yes.

16        Q.    And do you recall whether or

17   not you gave that to him in an envelope?

18        A.    I believe that, again, that

19   he picked it up from my office

20   personally, but I don't recall.

21             MR. GRAF:  I'm sorry, what

22        don't you recall?

23             MR. McDEVITT:  Whether it

24        was in an envelope.

ESQUIRE DEPOSITION SERVICES

62

```
 1          Q.    And when you say her
 2   attorney, who is the attorney identified
 3   on that fax?
 4          A.    Jane McIlhnenny.
 5          Q.    And is it your testimony, do
 6   you agree that you received it on
 7   January 25, 2002 at or about 2:38 p.m.?
 8          A.    What was the date?
 9          Q.    January 25, 2002.
10                MR. McDEVITT:  Where did you
11           get the time for that?
12                MR. MESTER:  Look at the
13           time stamp.
14                MR. McDEVITT:  Actually, it
15           says something p.m.  It's kind of
16           unclear on the document.
17                THE WITNESS:  I know that
18           there is a document somewhere
19           around here in the file that
20           indicates the time that the
21           document was faxed to me.  And so
22           as I'm sitting here right now, not
23           having that document right in
24           front of me, I don't know
```

63

```
 1              precisely what time it was, but I
 2              know that there is a document out
 3              there and I do believe that it was
 4              in the afternoon on the 25th.  I
 5              think that that is correct.
 6    BY MR. MESTER:
 7         Q.    Do you agree that this was
 8    your first notice you received of the
 9    bankruptcy?
10         A.    When you say this, you're
11    referring --
12         Q.    Referring to --
13         A.    -- referring to Sarner 33.
14    I'm hesitant only because it doesn't
15    have -- it says 10:00 p.m. on the front
16    of it, on the top of it.  So I'm not sure
17    whether this is the one or not.
18         Q.    Do you recall having
19    received any verbal, prior to January 25,
20    receiving any verbal notice of Mara's
21    bankruptcy?
22         A.    I received no verbal notice
23    of Mara's bankruptcy.
24         Q.    Mr. Sarner, I'm going to
```

ESQUIRE DEPOSITION SERVICES

64

```
 1    show you a document marked Sarner 21.

 2          A.    I reviewed it.

 3          Q.    Do you recognize this

 4    document that has been marked as Sarner

 5    21?

 6          A.    Yes.

 7          Q.    And did you receive this

 8    document?

 9          A.    I did.

10          Q.    And did you receive the

11    document on January 28, 2002?

12          A.    Is that a Monday?

13          Q.    I don't know.  To the best

14    of your recollection.

15          A.    To the best of my

16    recollection, I received it by fax, yes.

17    And it indicates it was faxed to me on

18    January 28.  So I believe that I did

19    receive it on that date, yes.

20          Q.    What was your reaction when

21    you received this letter?

22          A.    Well, I had several

23    reactions.  First of all, I was upset

24    that this had happened, and I didn't know
```

65

```
1    whether it was true or not.  But I was
2    upset that this had happened.  And I also
3    note that he says that Mr. Matusavage is
4    an employee of the firm.  That's not the
5    case.  Mr. Matusavage was never an
6    employee of the firm.
7         Q.    Did you call John after
8    receiving this letter?
9         A.    I did.
10        Q.    How soon after receiving the
11   letter did you call John?
12        A.    I don't recall.
13        Q.    What was the substance of
14   your conversation with John as it related
15   to the allegations set forth in this
16   letter?
17        A.    I think I asked him -- I
18   think I asked him what happened.  And
19   what he said was that he -- that they
20   were -- he was of the impression that
21   they were hiding her, that they wouldn't
22   produce her.  And I know I asked him
23   specifically whether this happened.  And
24   he said no, he never called her a sneaky
```

66

1    little thief.

2          Q.    Did you call Dr. Brown after

3    receiving this letter?

4          A.    At some point I did, yeah.

5          Q.    Do you recall how soon after

6    you received this letter you spoke to Dr.

7    Brown?

8          A.    No.

9          Q.    And during those

10   conversations, did you discuss the

11   substance of the allegations set forth in

12   the January 28, 2002 letter?

13         A.    What allegations?

14         Q.    That the process server went

15   to Peirce College and was abusive and

16   called her a thief?

17         A.    I know that I had -- I at

18   one point had a conversation with Dr.

19   Brown that it was alleged that this

20   happened.  I don't recall when that was.

21         Q.    What reaction, if any, did

22   Dr. Brown have to these allegations set

23   forth in the January 28, 2002 letter?

24         A.    I don't recall.  There was

ESQUIRE DEPOSITION SERVICES

72

```
 1          Q.    I'm going to show you what
 2     we'll mark as Mester 1.
 3                     -   -   -
 4                (Exhibit Mester 1 marked for
 5          identification.)
 6                     -   -   -
 7     BY MR. MESTER:
 8          Q.    I'm going to show you a
 9     document we've marked as Mester 1, which
10     I will represent are the Answers of John
11     Matusavage to the First Set of Combined
12     Request For Admissions, Interrogatories
13     and Request For Production of Attorney
14     Defendants.
15                MR. McDEVITT:  Are you going
16          to also give him the requests
17          themselves because the document
18          you handed him doesn't have the
19          question that it's responding to.
20                MR. MESTER:  I'm going to
21          refer and relate to the answer and
22          ask him some questions.
23                THE WITNESS:  I've reviewed
24          it.
```

ESQUIRE DEPOSITION SERVICES

73

 1   BY MR. MESTER:

 2        Q.    Have you seen this document

 3   before today?

 4        A.    Possible.

 5        Q.    I highlighted a response in

 6   paragraph 2 in which Mr. Matusavage

 7   represents that, quote, the relationship

 8   will best be characterized as a principal

 9   and agent relationship (as plaintiff's

10   Complaint alleges), rather than an

11   independent contracted one.  Do you agree

12   or disagree with this statement?

13        A.    I disagree.

14        Q.    And what facts do you have

15   that support your disagreement with this

16   particular statement?

17        A.    Well, I'll try to be as

18   inclusive as possible, but I may miss

19   something.  Essentially I believe he was

20   an independent contractor.  He certainly

21   was not treated as an employee for any --

22   or as an agent for any income tax

23   purposes.  He was not on our payroll.

24   And I had hired him to do a particular

ESQUIRE DEPOSITION SERVICES

74

1    job, a specific job, and that specific

2    job was to serve these papers on Mara

3    Flamm.  I didn't in any way give him

4    instructions as to how to do that job

5    other than to say this is where I think

6    she is, and you go ahead and serve it

7    there.  I didn't control the means and

8    methods by which he did it.  I didn't

9    tell him who to drop it off to, what to

10   say.  I didn't give him any of those

11   kinds of instructions.  He was an

12   independent businessman.  He advertised.

13   He solicited.  He contacted me as part of

14   his business in order to -- I suppose in

15   order to grow his business.  He contacted

16   me and I didn't give him any instructions

17   on how to do any of it.  Therefore, I

18   think he was an independent contractor.

19        Q.    Did John work on any of your

20   cases other than the Mara Flamm case?

21        A.    The answer is I don't think

22   so.  And the answer to your question is

23   contained in the records because I know

24   that we provided copies of the checks

1    that we had paid for him.  I think that

2    the copies of the checks were only

3    related to this particular case, and so,

4    therefore, I think that he only worked on

5    this particular case.  If he did work on

6    or do another little thing for me, that

7    would be reflected in the pay information

8    that has been previously provided.

9         Q.    Prior to retaining -- I

10   should say hiring John to serve process

11   for you, did you perform any sort of

12   background check on him to determine his

13   qualifications, criminal background,

14   anything of that nature?

15        A.    I certainly didn't do any

16   criminal background check on him.  Here's

17   what I can say.  I do know that I needed

18   a process server right at the moment that

19   I received this solicitation from him.  I

20   had a conversation with him.  Something

21   within the conversation that I had with

22   him led me to believe that he would be an

23   acceptable process server.  He must have

24   said something that led me to believe

86

```
 1         Q.    Is that your signature that
 2    appears on the last page?
 3         A.    It is.
 4         Q.    You signed it on August 12,
 5    '04?
 6         A.    I did.
 7         Q.    First, has anything changed,
 8    are there any facts that are changed
 9    since you executed this affidavit on
10    August 12, '04?
11              MR. GRAF:  Objection.
12              THE WITNESS:  To the best of
13         my ability, nothing has changed
14         since August 12.
15              MR. McDEVITT:  To the best
16         of your knowledge.
17              THE WITNESS:  To the best of
18         my knowledge.
19    BY MR. MESTER:
20         Q.    No material changes?
21         A.    To the best of my knowledge,
22    no material changes.
23         Q.    I want to direct your
24    attention to paragraph 12 of the
```

ESQUIRE DEPOSITION SERVICES

87

 1    affidavit in which you represent that you

 2    are personally on the list of attorneys

 3    maintained by the Philadelphia Bar

 4    Association Lawyer Referral Service

 5    available to accept cases in the area of

 6    collections.  Is that an accurate

 7    recitation?

 8         A.     In fact, it may not be

 9    entirely accurate.  Here's what I can say

10    about that.  When I left Duane Morris,

11    all of the clients who I had worked on

12    were Duane Morris' clients, so when I

13    joined my father in 1996, I was charged

14    with building my own practice.  One of

15    the things I did, I contacted the Lawyer

16    Referral Service in order to seek

17    additional clients through their service.

18    And how that works is that there are --

19    they send you some sort of questionnaire

20    about areas that you would like to be --

21    practice areas that you would like to be

22    placed on the list.  And I recall

23    reviewing that and then asking myself do

24    I feel qualified to offer services in

ESQUIRE DEPOSITION SERVICES

88

1    this area, this area, this area, and this

2    area.  And so I did that and I signed up

3    for a half dozen to a dozen practice

4    areas.  I believe that one of them was

5    collection cases.  And then periodically

6    over the years you have to renew the list

7    that you're on.  I don't know whether or

8    not I'm currently on the list for

9    collection matters.  I tend to think not.

10   I haven't seen a collection referral in a

11   very, very long time.

12              So as this says where I am

13   personally on the list of attorneys, I

14   don't know that that is accurate.  I was

15   for sure on the list at some point.

16   Whether I'm currently on the list, I'm

17   unsure.  It's easy enough to find out.

18        Q.    When is the last time you

19   filled out a questionnaire that refers

20   and relates to Lawyer Referral Service?

21        A.    I don't believe it's every

22   year, but I could be wrong.  It's

23   certainly not more frequently than once

24   per year.  It may be every other year.  I

ESQUIRE DEPOSITION SERVICES

89

1    don't know.  Whenever they sent me the

2    form, I filled it out.

3            Q.    Do you maintain those forms

4    in your office?

5            A.    No.

6            Q.    And to the extent that at

7    some time you had indicated you would

8    accept cases in the area of collections,

9    was there a distinction made between

10   consumer collection cases and what I'll

11   use the term as commercial or business

12   collection cases?

13               MR. GRAF:  Objection.  I

14           think you were referring to debt

15           and you had this broad definition

16           which could include a shareholder

17           lawsuit, anything like that.

18               MR. MESTER:  What I'm trying

19           to -- the language I'm trying to

20           parse is whether there is a

21           difference between consumer cases

22           and commercial or business cases.

23               MR. McDEVITT:  On the

24           Lawyers Referral form?

              ESQUIRE DEPOSITION SERVICES

90

```
 1              MR. MESTER:  Correct.

 2              THE WITNESS:  You would have

 3         to ask them and look at the Lawyer

 4         Referral firm.  My best

 5         recollection is that there was one

 6         category, collection.  What was

 7         contained in that, I'm not

 8         entirely sure.

 9   BY MR. MESTER:

10         Q.    Does your office currently

11   accept consumer debt collection cases?

12         A.    No.

13         Q.    Do you intend at any time in

14   the future to accept consumer debt

15   collection cases?

16         A.    I can't answer that other

17   than to say it would have to be on a

18   case-by-case basis.

19         Q.    But nothing in your practice

20   today will preclude you from accepting a

21   consumer debt collection case?

22              MR. McDEVITT:  Objection.

23         You can answer it if you

24         understand it.
```

```
 1                    THE WITNESS:  I'm a licensed
 2          attorney in Pennsylvania.  I can
 3          accept, if I choose to, any case I
 4          want.
 5  BY MR. MESTER:
 6          Q.    Do you agree that between
 7  1996 and 2004, you represented Dr. Brown
 8  in six consumer collection matters
 9  against patients of Dr. Brown?
10          A.    I would have to look at my
11  affidavit.  My affidavit indicates for
12  the two-year period 1998 to 1999 I
13  represented on three cases for Dr. Brown,
14  and for the years 2000, 2001 and 2002, I
15  worked on four cases for Dr. Brown.  So I
16  believe that there were seven total for
17  Dr. Brown, this case and six others, this
18  underlying case and six others.
19                    MR. McDEVITT:  What the
20          deponent is going to be looking at
21          is a collection of documents
22          numbered Sarner 937 to Sarner 967.
23                    THE WITNESS:  I reviewed
24          this document.
```

ESQUIRE DEPOSITION SERVICES

145

```
 1   recall.
 2        Q.   Did you, when Mr. Matusavage
 3   was present, ever refer to Ms. Flamm as a
 4   thief?
 5        A.   No.
 6        Q.   Did you ever refer to Ms.
 7   Flamm in Mr. Matusavage's presence as a
 8   sneaky little thief?
 9        A.   No.  The answer is no.
10        Q.   Had you ever met Ms. Flamm
11   before?
12        A.   No.
13        Q.   So her size was something
14   you knew nothing about?
15        A.   I knew nothing about her
16   size.
17        Q.   When you saw Mr. Matusavage
18   in January and instructed him or provided
19   him with the rule to show cause to serve,
20   did you instruct him to harass Ms. Flamm
21   or anybody at the place of her
22   employment?
23        A.   No.
24        Q.   When you saw Mr. Matusavage
```

146

```
 1    in January of 2002 and provided him with

 2    the document to serve, did you instruct

 3    or otherwise suggest to him that he

 4    should defame Ms. Flamm?

 5         A.    No.

 6         Q.    For point of clarification,

 7    in your understanding of what a principal

 8    and agent is, is a principal/agent

 9    relationship limited to an

10    employer/employee relationship?

11              MR. McDEVITT:  Objection.

12              You're asking him for his

13              knowledge of the law here.

14              MR. GRAF:  I'm trying to

15              clarify an earlier answer he gave

16              when he was asked about that

17              difference, he referred to reasons

18              why he didn't believe there was a

19              principal/agency relationship and

20              he made references in his answer

21              to why there wasn't an

22              employee/employer relationship.

23              I'm trying to clarify that prior

24              answer as to what he intended when
```

ESQUIRE DEPOSITION SERVICES

157

1      Referral Service in the area of

2      collections and if I were to testify

3      right now in full, I would repeat

4      everything that I said on this affidavit.

5            Q.    Did Sarner & Associates ever

6      hire any paralegals or additional

7      secretarial staff to handle collection

8      matters?

9            A.    No.

10           Q.    Have you ever represented a

11     business that is in -- well, let me

12     rephrase that.  Have you ever represented

13     a client that is in the business of

14     collecting delinquent consumer debts?

15           A.    No.

16           Q.    You have just mentioned that

17     you were at some point in time listed in

18     the Philadelphia Bar Association Lawyer

19     Referral Service as an attorney who

20     handles collection matters.  Correct?

21           A.    Correct.

22           Q.    Other than that listing --

23     well, let me strike that.

24                 Have you ever advised in any

ESQUIRE DEPOSITION SERVICES

158

1    newspaper, radio, television, print,

2    phone books, that you or your firm

3    handles collection matters?

4        A.    No.

5        Q.    Have you ever otherwise

6    actively marketed yourself as a

7    collections attorney?

8        A.    I'm not a collections

9    attorney and I've never marketed myself

10    as such.

11        Q.    Now, Mr. Brand had responded

12    to the October filing that was made upon

13    Ms. Flamm in his November 16, 2001

14    letter.  Correct?

15        A.    Will you repeat the

16    question?

17        Q.    Around October of 2001 you

18    had Mr. Matusavage serve a Notice of

19    Deposition upon Ms. Flamm at Peirce

20    College.  Correct?

21        A.    That's correct.

22        Q.    And sometime thereafter Mr.

23    Brand contacted you.  Correct?

24        A.    That's correct.

ESQUIRE DEPOSITION SERVICES

EXHIBIT 3

Case 2:02-cv-04302-MFA     Document 70-3     Filed 03/07/2005     Page 40 of 53
Monday 15 of Jul 2002, Taxination          ->21558  699          Page  8 of 21
JUL. 10. 2002  10:42AM    USTC JURN INS. SERV.              NO.NO. '415 P.:P. 55

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARA FLAMM                                      CIVIL ACTION
709 S. SCHELL STREET
PHILADELPHIA, PA 19147                          No.     02cv4302
    *Plaintiff*

vs.

SARNER & ASSOCIATES, P.C.
11 PENN CENTER, 29TH FLOOR
PHILADELPHIA, PA 19103

and

JOSHUA SARNER, ESQUIRE
11 PENN CENTER, 29TH FLOOR
PHILADELPHIA, PA 19103

and

LEONARD SARNER, ESQUIRE
11 PENN CENTER, 29TH FLOOR
PHILADELPHIA, PA 19103

and

JODI H. BROWN, M.D.
325 CHESTNUT STREET
SUITE 1308
PHILADELPHIA, PA 19106

and

JOHN MATUSAVAGE
1641 ETTING STREET
PHILADELPHIA, PA 19145

and

JOHN DOE PROCESS SERVER,
individually and as agent for
Sarner & Associates, P.C.,
Joshua Sarner, Esquire,
Leonard Sarner, Esquire, and Jodi H. Brown, M.D.,
11 PENN CENTER, 29TH FLOOR
PHILADELPHIA, PA 19103
    *Defendants*

## COMPLAINT-CIVIL ACTION

Plaintiff, Mara Flamm, by and through her undersigned counsel, brings this action against defendants, Sarner & Associates, P.C., Joshua Sarner, Esquire, Leonard Sarner, Esquire, Jodi H. Brown, M.D., John Matusavage and John Doe Process Server for violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA") and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. 201-1 et seq. ("UTPCPL") which prohibit creditors and debt collectors from engaging in abusive, deceptive, and unfair practices. Plaintiff also brings causes of action against Defendants for Intentional Infliction of Emotional Distress, Defamation--Slander and Civil Conspiracy.

### I.    JURISDICTION AND VENUE

1.    This court has original jurisdiction over this matter pursuant to 15 U.S.C. §1692k(d) and 28 U.S.C. §1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. Jurisdiction for declaratory relief in matter is available pursuant to 28 U.S.C. §§ 2201 and 2202.

2.    Venue in the Eastern District of Pennsylvania is proper because all defendants regularly conduct business in Philadelphia County, all defendants maintain their principal place of business in Philadelphia County and the events and occurrences giving rise to this cause of action took place in Philadelphia County.

### II.    PARTIES

#### A.    Plaintiff

3.    Plaintiff, Mara Flamm, is an adult individual who resides at 709 S. Schell Street, Philadelphia, Pennsylvania.

Case 2:02-cv-04302-MFA    Document 70-3    Filed 03/07/2005    Page 42 of 53

Monday 15 of Jul 2002, Taxination        ->21558 899        Page 10 of 21
JULJUL. 10. 2002  10:42AM    USIC. JURN IVS. SERV.                NO.NO. 415 P.5. 7>

**B.    Defendants and The Agents**

4.      Defendant, Sarner & Associates, P.C., is a professional corporation arising under and existing pursuant to the laws of the Commonwealth of Pennsylvania with its principal place of business at 11 Penn Center, 29th Floor Philadelphia, PA. 19103. Sarner & Associates, P.C. engages in the business of collecting debts in Commonwealth of Pennsylvania and regularly attempts to collect debts alleged to be due another. The principal purpose of Defendant Sarner & Associates, P.C. is the collection of debts using the mails, telephones and techniques of harassment.

5.      Defendant, Joshua Sarner, Esquire, is an adult individual and employee, agent and/or representative of Defendant Sarner & Associates, P.C. who regularly conducts business at 11 Penn Center, 29th Floor Philadelphia, Pennsylvania.   At all times material, Defendant Joshua Sarner, Esquire was and continues to be a debt collector for Defendant Sarner & Associates, P.C. as defined in 15 U.S.C. §1692a(6).

6.      Defendant, Leonard Sarner, Esquire, is an adult individual and employee, agent and/or representative of Defendant Sarner & Associates, P.C. who regularly conducts business at 11 Penn Center, 29th Floor Philadelphia, Pennsylvania.   At all times material hereto, Defendant Leonard Sarner, Esquire was and continues to be a debt collector for Defendant Sarner & Associates, P.C. as defined in 15 U.S.C. §1692a(6).

7.      Defendant, Jodi H. Brown, M.D., is an adult individual who regularly conducts business at 325 Chestnut Street, Suite 1308, Philadelphia, PA.  At all times material hereto, Jodi H. Brown, M.D. was a debt collector as defined in 15 U.S.C. §1692a(6).

8.      At all material times, Defendant Jodi H. Brown, M.D. controlled, directed, supervised, and/or approved the actions of Sarner & Associates, P.C., Joshua Sarner, Esquire, Leonard Sarner, Esquire, and John Doe with respect to the collection of a debt allegedly owed from Plaintiff.

Case 2:02-cv-04302-MFA   Document 70-3    Filed 03/07/2005    Page 43 of 53
Monday 15 of Jul 2002, Faxination        ->21558~699         Page 11 of 21
JuJUL. 10. 2002  10:42AM    USICS JURN IVS. SERV.                    NO NO. '415 F.P. 85

9.     Plaintiff believes, and therefore avers, that Defendant Jodi H. Brown, M.D. routinely and as a

continuing practice employed Defendants Samer & Associates, P.C., Joshua Samer, Esquire, and/or

Leonard Samer, Esquire to harass, annoy and pursue former patients with the knowledge that those

former patients had psychological frailties that could easily be exploited by the illegal debt collection

practices of Defendants.

10.    Defendant, **John Matusavage**, is an adult individual who regularly conducts business at who

regularly conducts business at 1641 Etting Street, Philadelphia, Pennsylvania. At all times material,

Defendant John Matusavage was and continues to be a debt collector for Defendant Samer &

Associates, P.C. as defined in 15 U.S.C. §1692a(6).

11.    Defendant, **John Doe Process Server**, is an unidentified adult Caucasian male who was and

continues to be a debt collector for Defendant Samer & Associates, P.C. as defined in 15 U.S.C.

§1692a(6).

12.    Plaintiff believes, and therefore avers, that Defendants Samer & Associates, P.C., and/or

Joshua Samer, Esquire and/or Leonard Samer, Esquire employed and/or contracted with John

Matusavage and John Doe Process Server as a process server and debt collector during the past five

years.

13.    Plaintiff believes, and therefore avers, that Defendants Samer & Associates, P.C., and/or

Joshua Samer, Esquire and/or Leonard Samer, Esquire employed and/or contracted with John

Matusavage and John Doe Process Server as a process server and debt collector to collect a debt

allegedly due from Plaintiff.

14.    At all material times, Defendant John Matusavage was an employee, agent, and/or

representative of Defendant Samer & Associates, P.C., Joshua Samer, Esquire, Leonard Samer,

Esquire, P.C., and/or Jodi H. Brown, M.D. and acted within the course and scope of such

employment, agency and/or representation.

15.    At all material times, Defendant John Doe Process Server was an employee, agent, and/or representative of Defendant Samer & Associates, P.C., Joshua Samer, Esquire, Leonard Samer, Esquire, P.C., and/or Jodi H. Brown, M.D. and acted within the course and scope of such employment, agency and/or representation.

III.    ALLEGATIONS OF FACT

16.    On or about February 20, 2001, Defendant Brown filed a Statement of Claim against Plaintiff in the Municipal Court of Philadelphia County alleging that Plaintiff owed her $5,000.

17.    On or about April 4, 2001, the Municipal Court entered a default judgment in favor of Defendant Brown and against Plaintiff in the amount of $6,215 plus $ 65 in costs.

18.    At all material times, Peirce College employed Plaintiff.

19.    On or about October 26, 2001, Defendant John Matusavage, an employee, agent and/or representative of Defendant Samer & Associates, P.C., served a Notice of Deposition in Aid of Execution ("Notice") at Peirce College in Philadelphia, Pennsylvania by leaving a copy of the Notice with Plaintiff's supervisor.

20.    Defendant Matusavage told Plaintiff's supervisor that Plaintiff owed a large debt to a doctor.

21.    Plaintiff did not grant permission for Defendants to contact her employer.

22.    On or about November 16, 2001, Robert P. Brand, Esquire contacted Defendants and advised Defendants that he represented Plaintiff.

23.    On or about January 22, 2002, Plaintiff filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code.

24.    On January 25, 2002, John Doe Process Server appeared at Plaintiff's place of employment without permission and demanded to see Plaintiff, Plaintiff's supervisor, Plaintiff's supervisor's

Case 2:02-cv-04302-MFA    Document 70-3    Filed 03/07/2005    Page 45 of 53

Monday 15 of Jul 2002, Faxination    ->21558 699    Page 13 of 21
JUL JUL. 10. 2002  10:43AM    USIC JURN INS. SERV.    NO. 415  P. 10

secretary, the Dean of College, and the Dean's secretary.

25.    Peirce College campus security summoned Carmita Rutling ("Rutling"), an administrative assistant at Peirce College, to deal with John Doe Process Server because he refused to leave voluntarily from Peirce College.

26.    John Doe Process Server told Rutling that he had a "problem with Ms. Flamm."

27.    John Doe Process Server then asked Rutling if she would accept a package for Plaintiff.

28.    While at the campus security desk, John Doe Process Server asked if he could speak privately with Rutling.

29.    Rutling directed John Doe Process Server to a room near the campus security desk and, immediately upon entering the room, John Doe Process Server began yelling at Rutling in a loud and aggressive tone.

30.    John Doe Process Server told Rutling "I don't know what type of sneaky little thieves you hire, but Mara Flamm stole thousands of dollars from a doctor and hasn't paid."

31.    John Doe then stated that he and Defendant Sarner & Associates, P.C. have been coming to Peirce College for over two years and that Plaintiff is always unavailable.

32.    Rutling then advised John Doe Process Server that this information was none of her business and that he should contact Plaintiff at home.

33.    John Doe Process Server then told Rutling that they have tried to reach Plaintiff at home but that Plaintiff gives them phony phone numbers and phony addresses and that contacting Plaintiff at her place of employment was the only way they knew of to contact her.

34.    John Doe Process Server then stated that Plaintiff received services for which Plaintiff refused to pay.

35.    John Doe Process Server then told Rutling that Plaintiff failed to appear in court.

36.    John Doe Process Server then repeated to Rutling that Plaintiff was a thief and that if Plaintiff

was the type of person that Peirce College has working for them, then Peirce College was in trouble.

37.    John Doe Process Server then told Rutling to tell Plaintiff that the next time they have to

come to her place of employment they will bring the Sheriff and arrest Plaintiff.

38.    Plaintiff is a good, true, honest and virtuous citizen of the Commonwealth of Pennsylvania,

and has, at all times, abided by and conducted herself in accordance with the laws of Pennsylvania,

and during her entire life has remained free from and unsuspected of any type of thievery, or any

other such crimes.

39.    Plaintiff was known and respected as a person of good name and reputation by reason of

which she has gained the love, goodwill, and esteem of all her neighbors and diverse other good

people of this Commonwealth.

40.    Plaintiff has never been guilty of the crimes charged by Defendants and the words that John

Doe Process Server uttered on behalf of himself, Defendant Sarner & Associates, P.C., Joshua

Sarner, Esquire, Leonard Sarner, Esquire and Jodi H. Brown, M.D., were and are untrue, and were

known by Defendants to be untrue when uttered and published.

41.    Defendants are persons of apparent responsibility whose position in life, and knowledge of

Plaintiff's affairs, was calculated to give credit to the charges and utterances made by them and their

agents.

42.    As a result of the negligent, reckless, malicious and illegal acts of Defendants, all of which

were done to further Defendants' businesses, Plaintiff suffered substantial mental pain, anguish, and

severe emotional distress.

43.    As a result of the negligent, reckless, malicious and illegal acts of Defendants, all of which

were done to further Defendants' businesses, Plaintiff suffered embarrassment and humiliation

resulting in great loss, detriment and suffering.

44.     Plaintiff believes, and therefore avers, that Defendants have a continuing policy and practice of harassing and embarrassing debtors at their workplace in order to coerce payment or make favorable payment arrangements.

45.     Plaintiff believes, and therefore avers, that Defendant Jodi H. Brown, M.D. purposely forwarded the collection of Plaintiff's debt and other debt collection matters to Defendants Sarner & Associates, P.C., Joshua Sarner, Esquire, and Leonard Sarner, Esquire  because she knew that Defendants Sarner & Associates, P.C., Joshua Sarner, Esquire, and Leonard Sarner, Esquire utilize unfair, oppressive and illegal tactics to coerce, embarrass and browbeat former patients to satisfy debts.

46.     Plaintiff believes, and therefore, avers, that Defendant Jodi H. Brown, M.D. had intimate knowledge of Plaintiff's fragile mental state and, accordingly, directed Defendants Sarner & Associates, P.C., Joshua Sarner, Esquire, and Leonard Sarner, Esquire to harass, annoy and embarrass Plaintiff to the point where she would satisfy the alleged debt.

## COUNT I
### Violation of 15 U.S.C. §1692, et seq.

47.     Plaintiff re-adopts and incorporates by reference paragraphs 1 through 46 as though more fully set forth below.

48.     Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq.

49.     Defendants violated the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq., as follows:

      (a)     Contacting Plaintiff's employer, a third party, without prior consent (15 U.S.C. §1692c(b));

      (b)     Falsely representing that the nonpayment of the debt would result in Plaintiff's arrest

when such action coul...ot be legally taken (15 U.S.C. §1692e(---and (5));

(c)    Falsely representing that Plaintiff committed a crime in order to disgrace, embarrass and humiliate Plaintiff (15 U.S.C. §1692e(7));

(d)    Attempting to contact Plaintiff at her place of employment after Defendants knew she was represented by attorney Robert P. Brand, Esquire (15 U.S.C. §§1692b(6) and 1692c(a)(2));

(e)    Using obscene or profane language to Ms. Rutling, the natural consequence of which was to abuse, scare and intimidate Ms. Rutling (15 U.S.C. §1692d(2));

(f)    Falsely representing that Plaintiff stole money in order to disgrace, embarrass and humiliate Plaintiff (15 U.S.C. §1692e(7));

(g)    Falsely representing to Plaintiff's employer that Defendants were forced to contact Plaintiff at her place of employment because Plaintiff had given them phony addresses and phone numbers when the Defendants knew her true address and telephone number as well as the address and telephone number of her attorney (15 U.S.C. §1692e(10)); and

(h)    Attempting to collect attorneys' fees incidental to the original obligation when said fees were not authorized by an agreement or permitted by law (15 U.S.C. §1692f (1)).

50.    As a direct and proximate result of these violations of the Fair Debt Collection Practices Act, Defendants are liable to Plaintiff for actual damages in excess of $75,000, statutory damages not to exceed $1,000, punitive damages, costs of the action, and attorney's fees.

WHEREFORE, Plaintiff, Mara Flamm, demands judgment in her favor and against Defendants, individually and/or jointly, in an amount in excess of $75,000 plus punitive damages,

attorney's fees, costs and such other relief as this Honorable Court deems appropriate.

## COUNT II
### Violation of 73 Pa.C.S.A. §201-1, et seq.

51.    Plaintiff re-adopts and incorporates by reference paragraphs 1 through 50 as though more fully set forth below.

52.    Defendants are a "person" as defined by 73 Pa.C.S.A. §201-2((2) of the Unfair Trade Practices and Consumer Protection Law.

53.    Defendants were engaged in "trade" or "commerce" as defined by 73 Pa.C.S.A. §201-2((2) of the Unfair Trade Practices and Consumer Protection Law.

54.    Defendants violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §201-1 et seq.

55.    Defendants violated the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa.C.S. §201-1 et seq., as follows:

(a)    Falsely representing that the nonpayment of the debt would result in the imprisonment of Plaintiff;

(b)    Falsely representing that that Plaintiff committed a crime or other illegal conduct for the purpose of embarrassing, humiliating and disgracing Plaintiff; and

(c)    Attempting to contact Plaintiff at her place of employment after Defendants knew she was represented by attorney Robert P. Brand, Esquire.

WHEREFORE, Plaintiff, Mara Flamm, demands judgment in her favor and against Defendants, individually and/or jointly as follows:

A.    Actual damages pursuant 73 Pa.C.S.A. §201-9.2(a) including, but not limited to, damages for pain and suffering;

B.    Statutory damages pursuant to 73 Pa.C.S.A. §201-9.2(a);

C.     Treble damages pursuant to 73 Pa.C.S.A §201-9.2(a);

D.     Reasonable attorney's fees, interest and costs pursuant to 73 Pa.C.S.A. §201-

9.2(a); and

E.     Punitive damages

F.     Such other and further relief as this Honorable Court seems just and proper.

### COUNT III
### Intentional Infliction of Emotional Distress

56.    Plaintiff re-adopts and incorporates by reference paragraphs 1 through 55 as though more

fully set forth below.

57.    As a direct and proximate result of the wrongful conduct of Defendants, Plaintiff suffered

severe embarrassment, humiliation, mental anguish and emotional distress.

58.    Defendants knowingly, willfully and intentionally acted to harm Plaintiff, the natural and

probable consequence of which was to cause Plaintiff extreme emotional distress.

59.    The conduct of Defendants was extreme and outrageous and beyond the bounds of decency.

60.    As a direct and proximate result of Defendants extreme and outrageous conduct, Plaintiff

suffered severe embarrassment, humiliation, mental anguish and genuine and substantial emotional

distress that physically manifested itself, among other ways, in headaches, loss of sleep, anxiety and

fright.

61.    Plaintiff is entitled to an award of punitive damages.

WHEREFORE Plaintiff, Mara Flamm, demands judgment in her favor and against

Defendants in an amount in excess of $75,000 plus punitive damages, costs of suit and such other

relief as this Honorable Court deems appropriate.

## COUNT IV
### Defamation—Slander

62.    Plaintiff re-adopts and incorporates by reference paragraphs 1 through 61 as though more fully set forth below.

63.    The statements of Joe Doe Process Server, individually and on behalf of Defendants Sarner & Associates, P.C., Joshua Sarner, Esquire, Leonard Sarner, Esquire and Jodi H. Brown, M.D. were false and defamatory, were made intentionally, willfully and maliciously and were made with knowledge of their falsity or with reckless disregard for their truth or falsity.

64.    The statement of Joe Doe Process Server, individually and on behalf of Defendants Sarner & Associates, P.C., Joshua Sarner, Esquire, Leonard Sarner, Esquire and Jodi H. Brown, M.D. are slanderous and defamatory per se.

65.    As a direct and proximate result of the false, misleading, and malicious statements, Plaintiff suffered and continues to suffer serious and irreparable injury to her name and reputation.

WHEREFORE, Plaintiff, Mara Flamm, demands judgment in her favor and against the Defendants, individually and/or jointly, in an amount in excess of $75,000 plus punitive damages, costs of suit and such other relief as this Honorable Court deems appropriate.

## COUNT V
### Civil Conspiracy

66.    Plaintiff re-adopts and incorporates by reference paragraphs 1 through 61 as though more fully set forth below.

67.    The actions of Defendants, jointly and severally, violated the Fair Debt Collection Act (15 U.S.C. §1692, et seq.), Pennsylvania's Unfair Trade Practices and Consumer Protection Law (73 Pa.C.S. §201-1, et seq.), and 18 Pa.C.S. §7311 (Unlawful Collection Agency Practices).

68.   The actions of Defendants, jointly and severally, were intended intentionally to cause emotional distress.

69.   The actions of Defendants, jointly and severally, were intended intentionally to defame Plaintiff.

70.   The overt actions of Defendants, *infra*, jointly and severally, constituted a civil conspiracy amongst them to engage in a concerted action for an illegal, unlawful and/or inappropriate purpose, namely to compel Plaintiff to satisfy the alleged debt through harassment, coercion, intimidation, and embarrassment.

71.   Defendants, acting in concert, were motivated by an improper and/or illegal attempt to compel Plaintiff to satisfy an alleged debt by means of harassment, coercion, intimidation, and embarrassment.

72.   Defendants acted with malice and the intent to deprive Plaintiff of her right to be free from harassment, coercion, intimidation, and embarrassment.

73.   There existed no justification for the improper and/or illegal actions of Defendants.

74.   As a direct and proximate result of Defendants improper and/or illegal actions, Plaintiff sustained actual damages.

    WHEREFORE, Plaintiff, Mara Flamm, demands judgment in her favor and against the Defendants, individually and/or jointly, in an amount in excess of $75,000 plus punitive damages, costs of suit and such other relief as this Honorable Court deems appropriate.


Robert P. Brand, Esquire
I.D. No. 73546
1200 Walnut Street, 5th Floor
Philadelphia, PA 19107
(215) 985-1500
Attorney for Mara Flam

Monday 15 of Jul 2002, Faxination    ->21558 699    Page 21 of 21
JUL. 10. 2002  10:45AM    USIC BURN INS. SERV.    NO NO. 415 P. 18

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

WILK & BRAND, P.C.

Robert P. Brand, Esquire
Attorney for Mara Flamm
1200 Walnut Street, 5th Floor
Philadelphia, PA 19107
(215) 985-1500