T OF CLAIM

OSTS

ndant(s)

NO.

pon the following claim:
ices ix at
is Mara Flame
at 709 Schell
provided

unt
5.00
6         %

e:

LUS COURT COSTS

1396

ndado:  Por la presente,
se a la siguiente vista en:

(Hora)

9:30 AM

the seal of the Court

rt

e contra las quejas que
ue se señalo.  Usted esta
oresencia y una querella
on, por dinero reclamado,
perder dinero, propiedad

NCAPACITADOS (AMERICANS
ER-VICIOS Y FACILIDADES DE
ERSONAS NO INCAPACITADAS
ABLES. PARA PODER RADICAR
EN LA CORTE MUNICIPAL POR
NABLES DEBE LLAMAR POR LO
IAS DESPUES DE RECIBIR SU

n excess of $2,500.
ion of such status.

EXHIBIT 4

January 2001
**Billing Summary**

**Mara Flamm**
708 B
South Perth Street
Philadelphia, PA 19147


Jodi H. Brown, MD.
325 Chestnut Street, Suite 1308
Philadelphia, PA. 19106
215-625-9055


**1997**
Initial Evaluation (99245) $190: April 14, 1997
Treatment Session (90844) $140:
April 21
May 5,12
June 9,16,25
July 2,9,16,23,30
August 6,18,20,27
September 5,12,19,25,30


Treatment Session (90844) $85:  Discounted Fee
October 8,9,14,15,16,21,22,23,28,29,30
November 4,5,6,10,11,12,18,19,20,25,26
December 2,3,4,9,10

**1998**
Treatment Session (90844) $85:  Discounted Fee
January 6,7,13,14,15,20,21,22,27,28,29
February 9,10,11,17,23,24,25
March 2,3,4,9,23,31
April 1,6,8,13,14,15,20,22,27,28,29
May 7,11
October 5


**Balance Due: $5415**

REDACTED PER 5.1.2

EXHIBIT 5

Signature

Signature - Plaintiff/Attorney

ADAM K. SILBERSTEIN, PRESIDENT JUDGE

COURT COSTS $ 65.50

Jodi H. Brown, M.D.
Constitution Place, Suite 1308
325 Chestnut Street
Philadelphia, PA 19106

MARA FLAMM
709 S. SCHELL STREET
PHILA., PA 19147

CODE

Plaintiff(s)

☐ CONS

ant(s)

| | PLAINTIFF | | DEFENDANT | | CASE CONTINUED TO |
|---|---|---|---|---|---|
| ☐ Appeared | ☐ Did Not Appear | ☐ Appeared | ☐ Did Not Appear | DATE | |
| ☐ Represented by:<br>(Name & Atty. No.) | ☐ Not Represented | ☐ Represented by:<br>(Name & Atty. No.) | ☐ Not Represented | ROOM | |
| | | | | JUDGE | |

**CASE MUST BE TRIED**

| | | | | DATE | |
|---|---|---|---|---|---|
| ☐ Appeared | ☐ Did Not Appear | ☐ Appeared | ☐ Did Not Appear | ROOM | |
| ☐ Represented by:<br>(Name & Atty. No.) | ☐ Not Represented | ☐ Represented by:<br>(Name & Atty. No.) | ☐ Not Represented | JUDGE | |

**TRIAL DISPOSITION**

PLAINTIFF    ATTY NO.              DEFENDANT    ATTY NO.

☑ Appeared    ☐ Did Not Appear              ☐ Appeared    ☐ Did Not Appear

060 ☐ No Service - Dismissed WITHOUT Prejudice

080 ☐ Judgment by Agreement (see Remarks)

061 ☐ Judgment for Plaintiff by Default
plus interest from        plus
Time of judgment    9:50    A.M.
P.M.

AMOUNT 6,215.00
COSTS 65.50

081 ☐ Judgment for Defendant - Default

082 ☐ Withdrawn from Court List without Prejudice
(will be relisted upon receipt of letter from
either party)

062 ☐ Judgment for Plaintiff
plus interest from        plus
Time of judgment    A.M.
P.M.

AMOUNT
COSTS

083 ☐ Withdrawn with Prejudice

084 ☐ Case Settled, Discontinued, and Ended

070 ☐ Judgment for Defendant

071 ☐ Judgment for Defendant as Plaintiff in
Counterclaim

AMOUNT

085 ☐ Case transferred to
Common Pleas Court

COURT NO.

072 ☐ Judgment for Plaintiff as a Defendant on
Counterclaim

AMOUNT

091 ☐ Case to be consolidated with
S.C. #

REMARKS

DATE                JUDGE

**COURT RECORD DISPOSITION**

03-7 (Page 2)

EXHIBIT 6

**SARNER & ASSOCIATES**
A PROFESSIONAL CORPORATION OF ATTORNEYS AT LAW

LEONARD SARNER
JOSHUA SARNER*
PAUL M. LEWIS**

OF COUNSEL: Edward B. Shils, Ph.D., S.J.D.

*Also Admitted in NJ
**Also Admitted in NY

11 PENN CENTER, 29TH FLOOR
PHILADELPHIA, PA 19103
TEL: (215) 496-1396
FAX: (215) 568-1044

13 TANNER STREET
HADDONFIELD, NJ 08033
TEL: (856) 616-9393
FAX: (856) 795-8221

October 18, 2001

**Via Certified Mail, RRR**
Ms. Mara Flamm
709 South Schell Street
Philadelphia, PA 19147

RE:     <u>Jodi H. Brown, M.D. vs. Mara Flamm</u>

Dear Ms. Flamm.

Enclosed please find a Notice of Taking Deposition in Aid of Execution in the above-referenced matter.

Sincerely,

JOSH SARNER

JS:lbh-a
Enclosure
cc: First Class Mail

Z 215 638 739

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail (See reverse)

| | |
|---|---|
| Sent to _Mara Flamm_ | |
| Street & Number _709 S. Schell St_ | |
| Post Office, State, & ZIP Code _Phila, PA 19147_ | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | |

Form 3800, April 1995

SARNER & ASSOCIATES
By: Joshua Sarner, Esquire
I.D. #54463
11 Penn Center, 29th Floor
Philadelphia, PA 19103
215-496-1396
Attorneys for Plaintiff

## IN THE PHILADELPHIA MUNICIPAL COURT

JODI H. BROWN, M.D.,                         :

            Plaintiff,           :  No. SC-01-02-20-1994

      v.                                     :

MARA FLAMM,                                  :

          Defendant,           :

## NOTICE OF TAKING DEPOSITION IN AID OF EXECUTION

To:   Mara Flamm
      C/O Peirce College
      1420 Pine Street
      Philadelphia, PA 19102-4699

      Mara Flamm
      709 S. Schell Street
      Philadelphia, PA 19147

PLEASE TAKE NOTICE that, pursuant to Pennsylvania Rule of Civil Procedure 3117, the undersigned will take the deposition upon oral examination of Mara Flamm, before a notary public or other person authorized by law to administer oaths. The deposition will commence on December 5, 2001, at 10:00 a.m., and continue from day to day until completed, unless otherwise adjourned. The testimony will be taken at the offices of Sarner & Associates, 11 Penn Center - 29th Floor, 1835 Market Street, Philadelphia, PA 19103, at which time and place Defendant is directed to appear and bring with him/her the following:

1.    All of Defendant's tax returns and supporting schedules (federal, state and local) which were filed, either individually or jointly, for the calendar years 1998 to the present.

2.    All passbooks, statements and deposit slips for the preceding twelve (12) months for any savings account, money market account, trust account, IRA accounts, 401(k) account, KEOGH plan, interest bearing account or similar account at any bank, savings institution, credit union or other financial institution held by Defendant, either individually or jointly.

3.    All statements, canceled checks, deposit slips and checkbook registers for the preceding twelve (12) months for any checking account held in Defendant's name, either individually or jointly.

4.    All stocks, bonds or other securities of any kind whatsoever owned by Defendant, individually or jointly, a list of all securities held by any other persons, brokerage houses or banks for Defendant in trust, by pledge or otherwise; and all statements, invoices and other documents from brokers or brokerage services in connection therewith.

5.    Any and all insurance policies or riders thereto, for the yeas 1998 to the present, which cover the loss of personal property where the Defendant is a named beneficiary.

6.    A list of all real estate owned by Defendant, or in which Defendant has or had any interest of any kind whatsoever, or which someone else held for Defendant in trust or otherwise, during the preceding twelve (12) months.

7.    Any and all financial statements whether prepared by or for the Defendant during the preceding twenty-four (24) months.

8.    Any application for a loan made by the Defendant, either individually or jointly, during the past twenty-four (24) months.

-2-

9.    All deeds, indentures, bonds, mortgages, title insurance policies, public liability insurance policies, tax bills, leases, and all other documents evidencing any legal or equitable interest in real estate owned by Defendant, or in which he/she has or had within the last twenty four (24) months any interest of any kind whatsoever or which someone else holds for him/her in trust or otherwise.

10.    Any and all certificates of deposit, promissory notes, security agreements, mortgages, mechanic's liens, or other evidences of indebtedness of any kind whatsoever owing to Defendant, individually or jointly, or held for Defendant in trust or otherwise.

11.    A list of all motor vehicles, mobile homes, or boats owned by Defendant, either individually or jointly.

12.    Any and all vehicle registration cards, titles, insurance policies, and all other documents evidencing any legal or equitable interest in any motor vehicles, mobile homes or boats owned by Defendant during the preceding twenty-four (24) months, or in which the Defendant has had any interest of any kind whatsoever or which someone else holds or has held for the Defendant in trust or otherwise.

13.    All documents reflecting the Defendant's right to receive royalties from any source.

14.    The names and locations of all banks or other institutions in which the Defendant rents or rented in the last twenty-four (24) months, a safe deposit box, and the keys thereto.

15. All documents evidencing if the Defendant is a beneficiary of any trust.

SARNER & ASSOCIATES

BY: _____
Joshua Sarner, Esquire
Attorney I.D. No. 54463
11 Penn Center - 29th Floor
1835 Market Street
Philadelphia, PA 19103
Phone: 215-496-1396
Fax:    215-568-1044

Dated: 10/19/01

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Marc Erdman
Renee Cullers
1920 Pine St.
Phila PA 19132-4566

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)
7 2015 6388 735

PS Form 3811, August 2001    Domestic Return Receipt    102595-01-M-2509

EXHIBIT 7

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2

 3                              - - -

   MARA FLAMM                    :     CIVIL ACTION
 4
         vs.                     :
 5
   SARNER & ASSOCIATES, P.C.,:
 6 et al.                              NO. 02-4302
                                - - -
 7

 8                      January 17, 2005

 9
                                - - -
10

11              Oral deposition of JOHN MATUSAVAGE,
12 taken pursuant to notice, was held at the Law Offices
13 of CHRISTIE, PABARUE, MORTENSEN and YOUNG, P.C, 1880
14 John F. Kennedy Boulevard, 10th Floor, Philadelphia,
15 Pennsylvania 19103, beginning at 10:00 a.m., on the
16 above date, before Joshua Lieberman, a Federally
17 Approved Registered Professional Reporter and Notary
18 Public in and for the Commonwealth of Pennsylvania.
19                              - - -
20

21

22              ESQUIRE DEPOSITION SERVICES
                      15th Floor
23          1880 John F. Kennedy Boulevard
              Philadelphia, Pennsylvania 19103
24                   (215) 988-9191
```

ORIGINAL

John Matusavage

1    Q.    Could you give me an outline of
2    your employment history.
3        A.    No.
4            MR. GRAF:  John, yes, you can.
5        A.    I have a business where I serve
6    Complaints and subpoenas.  I do investigative
7    work for law firms.
8        Q.    When did that business start?
9        A.    I've been doing this for sixteen
10    years.
11        Q.    Prior to the business that you --
12    what's the name of that business?
13        A.    John's Investigative Service.
14        Q.    Prior to opening John's
15    Investigative Service, did you have any
16    employment where you were serving Complaints or
17    anything like that?
18        A.    No.
19        Q.    Did you ever work for the
20    Philadelphia police force?
21        A.    No.
22        Q.    Did you ever work for the
23    Philadelphia sheriff's office?
24        A.    No.

John Matusavage

1        Q.      How did you learn the craft of
2    serving Complaints and investigations?
3        A.      On the job.
4        Q.      On the job after you started your
5    business?
6        A.      Yes.
7        Q.      And when you say sixteen years,
8    is that from today?
9        A.      Yes.
10        Q.      So you started in around 1979?
11        A.      No, 1985, '86, '87, in that
12    period.
13        Q.      That was when you started your
14    business, '85 or '87?
15        A.      Yes.
16        Q.      Prior to that, what experience
17    did you have with subpoenas and investigating?
18        A.      None.
19        Q.      So you've been doing this more
20    around ten years, nine years?  You gave me a
21    number of sixteen years.  I'm trying to figure
22    out --
23        A.      1988 through 2004.
24        Q.      Where were you employed prior to

John Matusavage

```
 1    1998?
 2              A.      That's irrelevant.
 3              Q.      Because it has absolutely nothing
 4    to do with service --
 5              A.      That's correct.
 6              Q.      Excuse me, if I can just finish
 7    my question. -- service of process or
 8    investigation?
 9              A.      That's correct.
10              Q.      Did you ever receive training in
11    the service of legal process?
12              A.      No.
13              Q.      How did you learn the rules of
14    process service?
15              A.      Through city records over in City
16    Hall.  They have brochures on procedures.
17              Q.      In 1988, when you opened John's
18    Investigative Service, why, if you didn't have
19    any background in serving subpoenas or doing
20    investigations, did you decide to open your own
21    business?
22              A.      Because I knew people that did
23    this before and it's no big problem.
24              Q.      Did you ask any of those people--
```

John Matusavage

1           A.      No, I didn't.

2           Q.      If I could finish my question,

3    sir.  Did you ask any of those people for

4    employment?

5           A.      No.

6           Q.      Why not?

7           A.      Because I had a good idea on how

8    to operate this business.

9           Q.      Did you have any issues in

10   working with other people?

11          A.      No.

12          Q.      Did you ever hire anybody else to

13   work in your business with you?

14          A.      No.

15          Q.      And did you ever apply to work

16   for a process server or a law firm or anything

17   like that?

18          A.      No.

19          Q.      How did you open your own

20   business?

21          A.      Through business procedure,

22   advertising.

23          Q.      Well, did you incorporate your

24   business?

John Matusavage

```
 1              A.     No.
 2              Q.     Did you ever write a business
 3  plan up?
 4              A.     No.
 5              Q.     Did you ever get an
 6  investigator's license in Pennsylvania?
 7              A.     No.
 8              Q.     Did you ever get investors to
 9  help you finance things?
10              A.     No.
11              Q.     Did any law firms, were they
12  initially associated with you when you opened
13  your business?
14              A.     No.
15              Q.     Did you obtain office space for
16  your business?
17              A.     No.
18              Q.     Where did your business operate?
19              A.     Out of my home.
20              Q.     That's the mail address you used?
21              A.     Yes.
22              Q.     Did you obtain a business phone
23  line?
24              A.     My home phone.
```

John Matusavage

1          Q.       And you used your home phone to

2     contact customers?

3          A.       Yes.

4          Q.       And they would contact you there?

5          A.       Yes.

6          Q.       Did you ever open a separate bank

7     account for the business?

8          A.       No.

9          Q.       Did you ever attempt to apply for

10    a credit card for the business?

11         A.       No.

12         Q.       Did you ever apply for a line of

13    credit for the business?

14         A.       No.

15         Q.       Do you know the start-up expenses

16    you incurred or continuing expenses for the

17    business?

18         A.       Basically my own travel expenses.

19         Q.       You mentioned advertising.  What

20    kind of advertising did you do?

21         A.       My business letters.

22         Q.       These letters you composed

23    yourself?

24         A.       Yes, sir.

John Matusavage

```
 1            Q.      And how did you distribute them?
 2            A.      Delivery, hand-delivered.
 3            Q.      You hand-delivered them?
 4            A.      Yes.
 5            Q.      You didn't send them through the
 6  mail?
 7            A.      No.
 8            Q.      Where did you get the list or how
 9  did you determine who you would deliver them to?
10            A.      Through the legal directory.
11            Q.      Did you ever join any
12  professional associations that dealt with process
13  service or investigation?
14            A.      No.
15            Q.      You paid for your own office
16  supplies and things?
17            A.      Yes.
18            Q.      You obtained a business license
19  for Philadelphia?
20            A.      No.
21                 MR. GRAF:  Is that a yes or no?
22                 THE WITNESS:  No.
23  BY MR. McDEVITT:
24            Q.      Did you ever buy a copy or a form
```

John Matusavage

```
 1   book for anything?
 2            A.     No.
 3            Q.     How did you get business forms
 4   for invoices or process service and things?
 5            A.     I had my own.
 6            Q.     Well, where did you get them?
 7            A.     I made them up.
 8            Q.     Did you ever have business cards
 9   printed?
10            A.     No.
11            Q.     Did you purchase a computer and a
12   printer?
13            A.     No.
14            Q.     You did it all with the
15   typewriter?
16            A.     Handwritten and typed.  Some
17   typing, yes.
18            Q.     Did you obtain Internet access
19   for your business?
20            A.     No.
21            Q.     In terms of the office supplies
22   and the business letters, where did you get the
23   money for these?
24            A.     Excuse me?
```

John Matusavage

1    Q.    How did you pay for the business
2  letters and the office supplies that you might
3  use?
4    A.    I bought them.
5          MR. GRAF:  He wants to know
6      whether they came out of your funds or
7      some law firm's funds.
8          THE WITNESS:  Out of my funds.
9  BY MR. McDEVITT:
10   Q.    Did you obtain a separate car for
11 the business?
12   A.    No.
13   Q.    Did you place your car into the
14 name of the business?
15   A.    No.
16   Q.    When you talked about travel
17 expenses, is that generally gas and upkeep of the
18 car?
19   A.    Train fare.
20   Q.    Would you usually use the train
21 more than --
22   A.    Yes.
23   Q.    -- using your own car?
24   A.    Yes.

John Matusavage

1    Q.    Now, where did you work primarily
2  come from, just attorneys or --
3    A.    Attorneys.
4    Q.    Other than attorneys, did you
5  also get any work from either court reporters or
6  other process servers?
7    A.    No.
8    Q.    Did you ever associate yourself
9  with any process serving networks like Server
10  Links.com or Process Service?
11    A.    No.
12    Q.    Did you ever obtain work from
13  other investigators?
14    A.    No.
15    Q.    You said that you had friends who
16  did this kind of work.  Did you ever do overflow
17  for them?
18    A.    No.
19    Q.    Did you ever do any mail
20  advertising?
21    A.    No.
22    Q.    Anything in the newspapers?
23    A.    No.
24    Q.    Any Internet advertising?

John Matusavage

1      A.     No.

2      Q.     I assume nothing on the T.V. or

3   the radio?

4      A.     That's correct.

5      Q.     Did you get referrals from

6   clients or friends?

7      A.     Some attorneys that I did work

8   for would tell other attorneys and they would

9   call.

10     Q.     How did you set up your fee

11  structure, was it a flat fee or an hourly fee?

12     A.     Flat fee.

13     Q.     And did you determine what that

14  would be by talking to your friends in the area?

15     A.     No.

16     Q.     How did you determine what fees--

17     A.     I made that determination.

18     Q.     What information did you base

19  that on?

20     A.     On time.

21     Q.     Do you know how many law firms

22  you might have been doing work for at any given

23  time between 1988 and 2004?  It's 2005 now.  You

24  still do this business, correct?

John Matusavage

1           A.      Yes.

2           Q.      So between 1988 and 2005, how

3    many law firms were you typically doing business

4    for?

5           A.      Approximately, a guesstimate,

6    about 250.

7           Q.      Now, that's the total number from

8    '88 to 2004?

9           A.      Yes.

10          Q.      At any one time, how many law

11   firms might you be doing process service work

12   for?

13          A.      It was on an everyday -- if they

14   needed me, they called me.

15          Q.      When a law firm would call you,

16   was it mostly process service or some

17   investigation?

18          A.      It's a combination of everything.

19          Q.      What services would you do, if

20   you could just list them for me?

21          A.      Basically serving Complaints and

22   subpoenas.

23          Q.      What about investigation?

24          A.      On occasion I did that.

John Matusavage

1      Q.      Would you say that the majority

2  of your work was serving Complaints?

3      A.      Yes.

4      Q.      How do you know whether you were

5  serving a Complaint or a subpoena?

6      A.      I didn't know what it was because

7  basically everything was in an envelope with the

8  person's name on it, on the envelope, and where

9  they resided.  What was inside the envelope, I

10  wouldn't know.

11      Q.      Did you usually -- what sort of

12  information would you get from your clients about

13  doing the service?

14      A.      Just name, address and location,

15  and sometimes hours of employment, what time they

16  work.  So this way, why waste time?

17      Q.      Did people generally talk to you

18  about what the case was about?

19      A.      No.

20      Q.      Now, when they would call you,

21  you would go to their office and get an envelope?

22      A.      Yes.

23      Q.      You were usually travelling by

24  train?

John Matusavage

```
 1              A.      Yes.
 2              Q.      Did any of these law firms
 3    provide you with office space?
 4              A.      No.
 5              Q.      Anybody give you a secretary?
 6              A.      No.
 7              Q.      Were you salaried by any of these
 8    law firms?
 9              A.      No.
10              Q.      Did you receive any benefits or
11    pensions?
12              A.      No.
13              Q.      Did any of these attorneys
14    provide you with train fare?
15              A.      No.
16              Q.      Was the travel expense built into
17    the flat fee?
18              A.      Yes.
19              Q.      Did any of the attorneys tell you
20    how to effect the service?
21              A.      No.
22              Q.      Did an attorney ever tell you if
23    the person isn't there, you have to find someone
24    who runs the office and then you can leave the
```

John Matusavage

```
 1              MR. GRAF:  I'm not so sure you
 2         answered that question specifically.
 3         Could you read it back.
 4                    (Whereupon the court reporter
 5         read back the last question as follows:)
 6              "Question:  Are there times when
 7         you can serve somebody other than the
 8         person who's listed on the envelope
 9         where you can exercise discretion?"
10              MR. GRAF:  It's yes or no.
11              THE WITNESS:  Yes. Other than the
12         person on the envelope, yes, you use
13         discretion.  If they're in a meeting,
14         you have the supervisor.
15  BY MR. McDEVITT:
16              Q.    Did any of the attorneys you've
17  ever served process or Complaints for instruct
18  you to scare or intimidate the person who's
19  listed on the envelope?
20              A.    I don't do work for attorneys
21  that handle that type of, carry that attitude.
22  If they want to intimidate somebody, they'll do
23  it.  I'm not going to be their paid goon.  I
24  handle everything on my own.
```

John Matusavage

1        Q.      So if somebody ever asked you to
2    do that, you would tell them to take a hike?
3        A.      No. I would tell them get
4    somebody else that wants to do that, because
5    that's not the way to handle things.  I don't
6    handle things like that.
7        Q.      Do any of the attorneys you work
8    for give you business cards printed with your
9    name on them?
10        A.      No.
11        Q.      Have you ever taken a card from
12    an attorney, written your name on it and handed
13    it to someone you were serving process to?
14        A.      No.
15        Q.      Within the last seven years, have
16    you ever been convicted of a crime?
17        A.      What does that have to do with
18    this?
19            MR. GRAF:   That's a relevant
20        question.
21        A.      No.
22        Q.      Have you ever been sued in a
23    civil suit?
24        A.      Other than this one?

John Matusavage

1           Q.      Other than this one, sir.

2           A.      No.

3           Q.      Do you know the firm Sarner &

4    Associates?

5           A.      Yes.

6           Q.      How do you know that firm?

7           A.      Joshua Sarner called me one day

8    on the phone and left a message that he needed a

9    subpoena, a Complaint on something served.

10          Q.      Do you know how he got your

11   number?

12          A.      Through my business letter.

13          Q.      Could you describe Joshua Sarner

14   for me.

15          A.      He's a white male, 30, 35, 5-10,

16   black hair, medium build, maybe 160, 165 pounds.

17   That's it.

18          Q.      When he called you, did you speak

19   on the phone or did you just go down to his

20   office?

21          A.      I stopped by his office the next

22   morning because the call was in on my tape

23   machine.

24          Q.      Was there anybody else in the

John Matusavage

1    office that morning?

2         A.    No.

3         Q.    What do you recall about that

4    first contact with Josh Sarner?

5         A.    He wanted a document served to a

6    Professor Mara Flamm.

7         Q.    Do you remember what he told you

8    about Professor Flamm?

9         A.    He never said anything about

10   Professor Flamm.

11        Q.    Do you remember where his office

12   was?

13        A.    1835 Market or JFK; I just forget

14   where.

15        Q.    Do you know how long you spoke

16   with him that first time?

17        A.    Five minutes, at the most.

18        Q.    Do you remember if he asked you

19   to do anything before the service of the process?

20        A.    No.

21        Q.    Do you remember how many times

22   total, I'm going to go down to some specifics,

23   but how many times overall you ever did work for

24   Sarner & Associates?

John Matusavage

1       A.    Once.

2       Q.    When you say "once," do you mean

3 once --

4       A.    When he called me; Mara Flamm.

5       Q.    But did you deliver only one

6 thing to Mara Flamm?

7       A.    Yes.  I was there twice.

8       Q.    Let me see if any of this jogs

9 your memory.

10       MR. McDEVITT:  Let's mark this as

11       M-1.

12       (Whereupon a bill entitled

13       John's Subpoena Service in the amount

14       of $100 was marked as M-1)

15       (Whereupon M-1 was

16       handed to the witness to peruse)

17 BY MR. McDEVITT:

18       Q.    Now, Mr. Matusavage, I've handed

19 you a document that was originally marked as

20 Sarner 206.  Have you ever seen this document

21 before?

22       A.    It's my handwriting, yes.

23       Q.    Is that your type face at the top

24 for John's Subpoena Service?

John Matusavage

```
 1          A.      I believe they weren't, no.
 2          Q.      And at the time you received this
 3 check, do you know how many other attorneys you
 4 were doing work for in September of 2001?
 5          A.      No.
 6          Q.      But you were doing work for many
 7 other attorneys at that time?
 8          A.      It all depends on where they
 9 called.  It all depends.
10          Q.      Was Sarner & Associates your
11 exclusive client in September, 2001?
12          A.      No.
13          Q.      Did Sarner & Associates or did
14 Josh Sarner ever ask you how many other clients
15 you had?
16          A.      No.
17          Q.      And you answered this generally
18 about other attorneys, but I'm going to ask about
19 Sarner & Associates.  Did Sarner & Associates
20 ever give you an office?
21          A.      No.
22          Q.      Did they ever give you health
23 insurance?
24          A.      No.
```

John Matusavage

1        Q.      Did they ever give you a pension
2    plan?

3        A.      No.

4        Q.      Did Sarner & Associates ever
5    allow you to pay into a 401K plan?

6        A.      No.

7        Q.      Did you ever ask Sarner &
8    Associates for any of these things?

9        A.      No.

10       Q.      Why didn't you?

11       A.      Because I have nothing to do with
12   Sarner & Associates.  I'm not an employee of
13   them.  I have no business dealings with them
14   other than he called me.  I did what he needed to
15   have done and that was it.

16       Q.      When you were doing your
17   investigation of Mara Flamm, did you learn
18   anything about her marital status?

19       A.      No.

20       Q.      Let me see if we can go back a
21   second.

22               Mr. Sarner originally called you
23          to serve a document on Mara Flamm.  You
24          couldn't effect service and then you

John Matusavage

1    statements about Miss Flamm?

2            A.    No.

3            Q.    Do you recall whether or not --

4    withdraw the question.

5                  Did you tell Miss Rutling that

6        Miss Flamm was a dirty little thief?

7            A.    No.

8            Q.    What do you recall about what

9    Miss Rutling looked like?

10           A.    5-2, maybe black hair, medium

11   build, 110 pounds.  The weight of a woman is

12   tough to guess.  Between 110 and 20 pounds.

13                 The conversation only lasted

14   forty-five seconds and I was gone.

15           Q.    Do you recall how she was

16   dressed?

17           A.    She had a checkered dress on, I

18   believe, or a skirt and blouse.  I don't recall.

19   I'll have to check.  I believe she had a skirt

20   and blouse on.  I'm not sure, really.

21           Q.    Latino?

22           A.    Black female.

23           Q.    Prior to service on the 24th of

24   January, you had a conversation with Mr. Sarner.

John Matusavage

```
 1   Did he call you and say.  "I've got something
 2   else to deliver"?
 3           A.      This is the same one, the same
 4   Complaint.
 5           Q.      Did you receive the Complaint in
 6   an envelope?
 7           A.      It was in a sealed envelope,
 8   that's correct.
 9           Q.      How did you know that it was the
10   same one as the one in October?
11           A.      Because I had possession of it
12   from day one.
13           Q.      Okay.  I'm confused then.
14           A.      There is no confusion.  The first
15   time he gave me the subpoena and Complaint, I
16   went to the address on Percy Street.  It was a
17   bad address.  I retained possession of that
18   document in the envelope and I held it until
19   January and I served it with Miss Flamm, Miss
20   Mara Flamm for Perkins or Rutling.
21           Q.      What did you serve on October
22   26th on Miss Perkins?
23           A.      The same thing.
24           Q.      Did Mr. Sarner originally give
```

John Matusavage

1  you two copies of this in envelopes?

2           A.      One copy.  Apparently I believe

3  it may have came back.

4           Q.      How did you know it came back?

5           A.      I don't.

6           Q.      So how did you know when you had

7  the document in January that you had the same

8  envelope that you had left with Miss Perkins in

9  October?

10          A.      Because, if I recall, I think

11 Josh may have called me, "Come pick it up because

12 they sent it back."  And that's the same document

13 that I had taken originally to serve, and then on

14 January 24th I served it again or whatever the

15 date, yes, January 24th.

16          Q.      I don't have a document to jog

17 your memory.

18          A.      I wouldn't have any idea what

19 that document looks like.

20          Q.      Well, I'm just going to give you

21 a hypothetical.  Is it possible that Mr. Sarner

22 said that he attempted to mail a document to Miss

23 Flamm; he received the document back?

24          A.      I have no idea, no. I don't know.

John Matusavage

1          Q.      So as far as you knew, the

2     envelope that you got to deliver in January of

3     2002 was the same one you had delivered in

4     October?

5          A.      That's correct.

6          Q.      And you have no knowledge of

7     whether anything inside the envelope had changed

8     between October and January?

9          A.      I have no knowledge of what was

10    inside that envelope.

11         Q.      Do you recall whether the

12    envelope looked like it was worn or beaten up?

13         A.      No.

14         Q.      Do you recall whether it looked

15    like a new envelope?

16         A.      It was a white envelope, a

17    business envelop.

18         Q.      But did it have scuffs or marks?

19         A.      Not that I recall, no.

20         Q.      When Josh called you up and said

21    the document came back, how much of a

22    conversation did you have with Josh at that time?

23         A.      Okay.  I said, "I'll pick it up

24    and I'll try it again."

John Matusavage

1    Q.    When you went over to Josh to
2  pick this up, did you talk about Miss Flamm?
3    A.    No.
4    Q.    When you were talking with Josh
5  that time, did he refer to Miss Flamm as a thief
6  or a dirty little thief?
7    A.    Not to my knowledge.
8    Q.    Did he provide you with any
9  additional instructions about how to get this
10  served in such a way that it wouldn't come back?
11    A.    No.
12    Q.    Now, did Mr. Sarner tell you to
13  be rude or threatening?
14    A.    No.
15    Q.    Did Mr. Sarner tell you to talk
16  to Miss Flamm's supervisors about the case?
17    A.    No.
18    Q.    Did Mr. Sarner tell you to call
19  Miss Flamm names?
20    A.    No.
21    Q.    Did Mr. Sarner tell you to
22  intimidate Miss Flamm?
23    A.    No.
24    Q.    And if he had told you these

John Matusavage

```
 1  things, you wouldn't have taken the job?
 2        A.    That's correct.
 3        Q.    When Mr. Sarner gave you this
 4  envelope back to try to deliver again, did he
 5  instruct you about how to dress when you went
 6  over there?
 7        A.    No.
 8        Q.    Did he tell you whether you had
 9  to walk or take a cab?
10        A.    No.
11        Q.    Did he tell you when he had to
12  have this return of service back?
13        A.    No.
14        Q.    Did he tell you how to invoice
15  the case?
16        A.    No.
17        Q.    In January of 2002, was Sarner &
18  Associates your exclusive client?
19        A.    No.
20        Q.    You had other attorneys you were
21  doing work for?
22        A.    That's correct.
23        Q.    Do you recall how much you
24  charged for that service?
```

John Matusavage

1        Q.    Mr. Matusavage, I've handed you a

2    document we've marked today as M-10, which is

3    originally produced as Sarner 21.  It is a

4    January 28, 2002, letter from Robert Brand to

5    Joshua Sarner.  Have you ever seen this document

6    before, sir.

7             MR. GRAF:  Is there a copy line

8         that perhaps is on another page?

9             MR. McDEVITT:  I'm not aware of

10        one, no.

11             THE WITNESS:  No.

12    BY MR. McDEVITT:

13        Q.    Do you recall every -- well, let

14    me withdraw that.

15             When you spoke with Carmita

16        Rutling on January 24, 2002, you didn't

17        tell Miss Rutling that Miss Flamm owed

18        six thousand dollars to a doctor?

19        A.    No, I did not.

20        Q.    When you spoke with Miss Rutling,

21    you didn't tell Miss Rutling that Miss Flamm had

22    been giving different names or addresses to

23    people?

24        A.    No, I did not.

John Matusavage

```
 1        Q.      You did not yell at Miss Rutling?

 2        A.      No, I did not.

 3        Q.      You did not tell Miss Rutling

 4   that a sheriff would come and arrest Miss Flamm?

 5        A.      No, I did not.

 6        Q.      And you did not call Miss Flamm a

 7   sneaky little thief?

 8        A.      No, I did not.

 9        Q.      Do you recall completing request

10   for admissions in this action?

11        A.      No.

12        Q.       I've got to give you this, too,

13   because there's questions and there's answers.

14   So let's label the request for admissions as M-11

15   and label the responses as M-12.

16                         (Whereupon a document entitled

17             Attorney Defendants' First Set Of Combined

18             Request For Admissions, Interrogatories And

19             Request For Production Directed To Defendant,

20             John Matusavage was marked as M-11)

21                         (Whereupon a document entitled

22             Defendant, John Matusavage's Answers To

23             The First Set Of Combined Requests For

24             Admissions, Interrogatories And Request Of
```

John Matusavage

```
 1          Investigative Service; is that correct?
 2          A.      That's correct.
 3          Q.      And in reviewing several of the
 4  invoices, including M-1, I noticed on top it says
 5  John's Subpoena Service.  Is John's Subpoena
 6  Service and John's Investigative Service the same
 7  thing, the same company?
 8          A.      One and the same, yes.
 9          Q.      And does it matter?  I mean, do
10  you represent yourself that there's a difference?
11  Is the investigative service business any
12  different from the subpoena service business?
13          A.      I do both.
14          Q.      Do you need a license to serve
15  process in Philadelphia County?
16          A.      Not to my knowledge, no.
17          Q.      Do you know whether or not you
18  need a license to serve process in the any of the
19  surrounding counties, including Bucks, Delaware,
20  Montgomery or Chester County?
21          A.      I'm not certain.
22          Q.      Do you need any formal training
23  or certifications to serve process?
24          A.      No.
```