EXHIBIT 14

## W&B

### WILK & BRAND, P.C.
ATTORNEYS AT LAW

1200 WALNUT STREET, 5TH FLOOR • PHILADELPHIA, PA 19107 • TELEPHONE (215) 985-1500 • FAX (215) 546-5355

Ronald G. Wilk
Robert P. Brand
Laurence A. Mester
Michael D. Caramelo
Pierre S. Rosen

MONTGOMERY COUNTY OFFICE
P.O. BOX 333
BLUE BELL, PENNSYLVANIA 19422
(215) 542-1613
FAX (215) 542-0996

NEW JERSEY OFFICE
4 GREENTREE CENTRE, SUITE 201
MARLTON, NEW JERSEY 08053
(856) 983-7325
FAX (856) 983-9657

January 28, 2002

Via Facsimile Transmission & U.S. Mail
(215) 568-1044
Joshua Sarner, Esquire
SARNER & ASSOCIATES
11 Penn Center, 29th Floor
Philadelphia, PA 19103

RE: Jodi H. Brown, M.D. v. Mara Flamm

Dear Mr. Sarner:

On Friday, January 25th an employee of your firm appeared at Ms. Flamm's workplace harassing her and her fellow employees. When he was unable to speak with Ms. Flamm, he demanded to see her supervisor and then the dean of the College. When that was not possible, he took an administrative assistant aside and screamed at her that he did not know what type of people they hire at Peirce College and that she owes $6000 to a doctor. He further told the administrative assistant that Ms. Flamm has been giving different names and addresses in efforts to avoid him. He yelled at the administrative assistant and told her that the next time he came back would be with the Sheriff to arrest Ms. Flamm. He concluded his tirade by stating Peirce College has a hired a "sneaky little thief".

I do not know what type of practice you run, but this type of workplace harassment and defamation are unacceptable and actionable at law. I am further incensed that you engaged in this type of harassment knowing full well that Ms. Flamm is my wife. I expected some type of civility from you and your firm but received none. You will receive the same courtesies from me in the suit I intend to file against you and your firm.

Very truly yours,

WILK & BRAND, P.C.

ROBERT P. BRAND

EXHIBIT 15

I received a phone call from the front desk around 1:00pm. The guard asked if Mara Flamm was in and I told her that she was in a meeting. She repeated what I said a gentleman replied, "is her supervisor available". The guard asked if her supervisor available and I replied, "is this an advising or faculty problem". The gentleman replied in a loud tone "it's a problem with her". I then asked the guard to put the gentleman on the phone. I asked if I could help him. He said that he needs to speak with Mara Flamm. I asked if he was a student and he replied no. I told him that she was in a meeting and is not available. He then asked for her supervisor. I told him that they were in the meeting together. He then asked who I was and I told him. He then asked if I could accept a package for Mara. I told him yes and that I would be down. I went to the lobby and he asked if we could go somewhere and talk. At this point I was a little skeptical because of the tone of his voice and the way he looked. But because I got such a bad vibe from this person, I said yes. I used on of the empty offices in the IT area on the first floor. We step into the office and he immediately began lashing out in a very aggressive tone. He said that "I don't know what kind of sneaky little thieves you hire, but Mara Flamm stole thousands of dollars from a doctor and haven't paid". He also said that they have been coming here looking for her for over two years and every time they come she is always unavailable. I then said that you know this is none of my business and why haven't you contacted her at home. He said they have tried and she's given them phony addresses and phone numbers and this is the only way they have been able to contact her. He then said that a service was provided to Mara and that she is not paying up. She was to appear in court and never showed up. He then repeated that she was a thief and that if these are the type of people we have working for us we are in trouble. He told me to tell her that the next time they have to come, they will bring the sheriff and arrest her. He then passed me an envelope and asked that I make sure that she receives it. He apologized to me for having to hear this and left.

I was very upset for having to hear this and shocked that he told me. I was very embarrassed for Mara because he came to the job and basically told anyone who would listen her personal business. He didn't appear professional at all. He was very aggressive, loud and nasty.

*Carmita Rutling*

Carmita Rutling
Administrative Assistant
Peirce College

Sarner18

EXHIBIT 16

1           IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3                      - - -

4    MARA FLAMM,                    :    CIVIL ACTION

                    Plaintiff,      :

5                                   :

          v.                        :    **ORIGINAL**

6                                   :

     SARNER & ASSOCIATES, P.C. :

7    and JOSHUA SARNER, ESQUIRE :

     and LEONARD SARNER,            :

8    ESQUIRE and JODI H. BROWN :

     M.D. and JOHN MATUSAVAGE,      :

9                    Defendants :    NO. 02-4302

10                     - - -

                August 16, 2004

11                     - - -

12                 Oral deposition of CARMITA

13   RUTLING, held in the offices of Christie,

14   Pabarue, Mortensen & Young, 1880 John F.

15   Kennedy Boulevard, 10th Floor,

16   Philadelphia, Pennsylvania 19103,

17   commencing at 4:05 p.m., on the above

18   date, before Torre Lynn Adams, Court

19   Reporter and Notary Public of the

20   Commonwealth of Pennsylvania.

21                     - - -

22        ESQUIRE DEPOSITION SERVICES

                 15th Floor

23      1880 John F. Kennedy Boulevard

        Philadelphia, Pennsylvania  19103

24             (215) 988-9191

Rutling

1    to put in that you didn't get to put in?

2         A.        No.

3         Q.        Now, with regard to the

4    deliveryman, do you know who else this

5    person spoke to at Pierce?

6         A.        Who the delivery guy spoke

7    to?

8         Q.        Yes.

9         A.        Just the security guard.

10        Q.        Did you ever discuss this

11   incident with your co-workers?

12        A.        No.

13        Q.        What about your supervisor?

14        A.        I haven't spoke to her

15   about it until the subpoena had came.

16                  MR. GRAF:  Which subpoena,

17       yours?

18   BY MR. McDEVITT:

19        Q.        The subpoena for your

20   testimony here today?

21        A.        Yes.

22        Q.        And you and I spoke about

23   scheduling this matter?

24        A.        Correct.

Rutling

1      Q.      Do you recall what your --
2    what the conversation with your
3    supervisor consisted of?
4      A.      I just told her that I had
5    the subpoena to be deposed, and I gave
6    her a copy of it so that she can approve
7    me to leave early.
8      Q.      Did you talk about the
9    reason you were being subpoenaed?
10      A.      I told her that it was a
11    civil case that Mara was going through,
12    and I was a witness.
13      Q.      Did you discuss or relate
14    to her the incident that formed the basis
15    of the case?
16      A.      No.
17      Q.      Did you ever discuss this
18    incident with people outside of Pierce?
19      A.      I probably told my brother.
20      Q.      Has your brother ever met
21    Mara Flamm?
22      A.      No.
23      Q.      Can you think of anyone
24    else outside of Pierce that you might

Rutling

1    have spoken to about this incident?

2        A.        That's it.

3        Q.        Did you ever hear people at

4    Pierce talk about that incident?

5        A.        No.

6        Q.        And you said you hadn't

7    heard any gossip about Mara Flamm?

8        A.        Um-um.

9        Q.        And no gossip about the

10   incident or that crazy guy that came in

11   one day to deliver something?

12       A.        No.

13       Q.        Had you ever met any other

14   person who came to Pierce to try to --

15   withdraw that.

16                 Have you ever met anybody

17   else who came to Pierce who said that

18   they were there to collect money from

19   Mara Flamm?

20       A.        No.

21       Q.        Do you know if Mara Flamm

22   ever received any warnings or sanctions

23   or disciplinary actions from Pierce?

24       A.        No.

Rutling

1      Q.        At that point you knew that

2   you could throw him out of there, right?

3      A.        He wanted to talk, I'm not

4   going to say, okay, whatever --

5      Q.        But you had a security

6   guard there that could throw him out?

7      A.        Yes.

8      Q.        Security force?

9      A.        The security, uh-hum.

10     Q.        You then went into this

11  private room with him; is that right?

12     A.        Uh-hum.

13     Q.        Words were said back and

14  forth; is that right?

15     A.        Yes.

16     Q.        Now, you indicated earlier

17  that he said something about Mara being a

18  thief?

19     A.        Yes.

20     Q.        Did you think that she was

21  a thief?

22     A.        Did I think that she was a

23  thief?

24     Q.        Right.

Rutling

```
 1          A.        At the time?

 2          Q.        Yes.

 3          A.        I didn't even care if she

 4   was a thief or not.

 5          Q.        Did you ever think that she

 6   was a thief?

 7          A.        No, I had no reason to

 8   think that she was a thief.

 9          Q.        He said that she had stolen

10   money from a doctor?

11          A.        Right.

12          Q.        Did he say how much?

13          A.        He said thousands of

14   dollars.

15          Q.        Thousands of dollars.

16                    Did you think then that

17   that was a true statement that she had

18   stolen money from a doctor?

19          A.        I didn't know what to

20   think.  I just knew that he was upset and

21   that he was telling me something that I

22   shouldn't have been hearing.

23          Q.        But you didn't believe him

24   when he said she stole thousands of
```

Rutling

```
 1   dollars?
 2          A.        I don't think I thought
 3   about believing him or not believing him,
 4   I was just listening.
 5          Q.        I'm looking at your
 6   statement.  There's a reference here to
 7   sneaky little thief.  Did you think that
 8   Mara was a sneaky little thief?
 9          A.        It was just his statement.
10          Q.        You didn't believe it,
11   though?
12          A.        It wasn't even for me to
13   believe.  I couldn't believe he was
14   standing there saying that.
15          Q.        You didn't think that was
16   true?
17          A.        No.
18          Q.        And you told him that that
19   was none of your business?
20          A.        None of my business.
21          Q.        And then you asked him why
22   he had not contacted her at home; is that
23   right?
24          A.        Yes.
```

Rutling

1    had filed for bankruptcy?

2           A.        No.

3           Q.        Did you ask her about why

4    this had happened?

5           A.        No.

6           Q.        You didn't ask her about

7    why the incident had happened at all?

8           A.        No.

9           Q.        She did apologize, but she

10   didn't apologize for herself, she

11   apologized for the person who came in,

12   right?

13          A.        Right.

14          Q.        She didn't apologize for

15   what she did?

16          A.        No.

17          Q.        Did you believe anything

18   that this guy said about Mara, the

19   process server?

20          A.        I can't say that I did.

21          Q.        After you spoke to Mara the

22   first time, how did she take it, how did

23   she react?

24          A.        She was upset.

Rutling

1       Q.        Did you see any signs of

2   anxiety?

3       A.        Anxiety, no.

4       Q.        Short temper?

5       A.        No.   Mara is always in like

6   a good, bubbly mood.

7       Q.        Did she stay in a good,

8   bubbly mood after this?

9       A.        Uh-hum.

10      Q.        Only during the afternoon

11  of the day the process server was there

12  was she not in a good mood?

13      A.        No, she wasn't.

14      Q.        Every day you saw her

15  thereafter she was in a bubbly mood?

16      A.        I mean she was her normal

17  self.

18      Q.        Did you notice that she

19  started missing classes at all after this

20  incident?

21      A.        I don't keep up with her

22  class schedule, I know when she's in the

23  office.

24      Q.        Did she start coming into

1              MR. McDEVITT:   Just a

2        couple follow-up questions.

3                  -   -   -

4                EXAMINATION

5                  -   -   -

6    BY MR. McDEVITT:

7         Q.          When you took the process

8    server aside into the college offices I

9    believe you said, is that correct, were

10   the people who usually work in those

11   offices attending the same meeting that

12   Mara Flamm was attending?

13        A.        No.

14        Q.          After this incident with

15   the process server, did your relationship

16   with Mara Flamm change at all?

17        A.        No.

18        Q.          Did you feel any

19   differently towards Mara Flamm at all?

20        A.        No.

21        Q.          Do you believe that she

22   acted any differently towards you?

23        A.        No.

24              MR. McDEVITT:   I have no

EXHIBIT 17

( )

# W&B
## WILK & BRAND, P.C.
### ATTORNEYS AT LAW

1200 WALNUT STREET, 5TH FLOOR • PHILADELPHIA, PA 19107 • TELEPHONE (215) 985-1500 • FAX (215) 546-5355

MONTGOMERY COUNTY OFFICE
P.O. BOX 333
BLUE BELL, PENNSYLVANIA 19422
(215) 542-1613
FAX (215) 542-0956

NEW JERSEY OFFICE
4 GREENTREE CENTRE, SUITE 201
MARLTON, NEW JERSEY 08053
(856) 985-7525
FAX (856) 988-0657

March 25, 2002

**Via Facsimile Transmission & U.S. Mail**
**(215) 568-1044**
Joshua Sarner, Esquire
**SARNER & ASSOCIATES**
11 Penn Center, 29th Floor
Philadelphia, PA 19103

RE:  <u>Jodi H. Brown, M.D. v. Mara Flamm</u>

Dear Mr. Sarner:

Please be advised that I have been retained by Mara Flamm with respect to the above-captioend matter.  Do not contact my client, particularly at her workplace, for any reason whatsoever.  Any notices, correspondence or other documents regarding her Bankruptcy Petition should be addressed to her attorney, Jane MacElhenney, Esq..  Any notices, correspondence or other documents regarding all other matters shall be addressed to me.

If you have any questions, please advise in writing.

Very truly yours,

WILK & BRAND, P.C.

ROBERT P. BRAND

RPB/mdf

Sarner26

EXHIBIT 18

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

 3                       - - -
 4       MARA FLAMM,               :  CIVIL ACTION
                    Plaintiff,  :
 5                                 :
                    V.             :
 6                                 :
         SARNER & ASSOCIATES, P.C. :
 7       and JOSHUA SARNER, ESQUIRE:
         and LEONARD SARNER,       :
 8       ESQUIRE and JODI H. BROWN :
         M.D. and JOHN MATUSAVAGE, :
 9                    Defendants :  NO. 02-
4302

10                       - - -
                    August 16, 2004

11                       - - -

12                    Oral deposition of MARA

13       FLAMM, held in the offices of
Christie,

14       Pabarue, Mortensen & Young, 1880 John
F.

15       Kennedy Boulevard, 10th Floor,

16       Philadelphia, Pennsylvania 19103,

17       commencing at 11:23 a.m., on the above

18       date, before Torre Lynn Adams, Court

19       Reporter and Notary Public of the

20       Commonwealth of Pennsylvania.

21                       - - -
22            ESQUIRE DEPOSITION SERVICES
```

```
 1          A.          I think she said he was
 2   short, that's all I remember as far as
 3   the description goes.
 4          Q.          By short, shorter than her?
 5          A.          I guess.   I don't know.
 6          Q.          How tall is she?
 7          A.          I don't know.
 8          Q.          Is she taller than you?
 9          A.          She's taller than me, which
10   doesn't say much, but she's taller than
11   me.
12          Q.          This person, was he able to
13   speak with the dean?
14          A.          The dean wasn't there.
15          Q.          Was she able to tell you
16   who else heard the interaction?
17          A.          She didn't see, but she
18   said people could have certainly heard.
19          Q.          Did she tell you that she
20   told other people about it?
21          A.          No.
22          Q.          To your knowledge, she
23   never spoke about this with anyone else?
24          A.          Right.
```

Flamm

```
 1          Q.          Did anyone else at Pierce
 2    ever approach you to speak about the
 3    delivery of the document?
 4          A.          No.
 5          Q.          Who at Pierce have you
 6    discussed the delivery of the documents
 7    with?
 8          A.          Nobody.
 9          Q.          Just Carmita?
10          A.          Just Carmita, yes.
11          Q.          Did you or someone on your
12    behalf obtain a statement from Ms.
13    Rutling?
14          A.          My attorney, I'm assuming.
15          Q.          Did you obtain a statement
16    personally?
17          A.          No.
18          Q.          Did you have any part in
19    the conversations between your attorney
20    and Ms. Rutling about providing a
21    statement?
22          A.          No.
23          Q.          You didn't have your
24    attorney come to your office and advise
```

Flamm

1   Carmita -- and say this is my attorney?

2          A.        No.

3          Q.        Do you know how her

4   statement was prepared?

5          A.        No.

6          Q.        Do you know if she typed it

7   or if your attorney typed it for you?

8          A.        No.

9          Q.        No, you don't know or --

10         A.        I don't know.

11         Q.        In January of 2002, an

12  attorney filed a voluntary bankruptcy

13  petition on your behalf?

14         A.        Yes.

15         Q.        And your attorneys were Mr.

16  Brand and Jane MacElhenney

17  M-A-C-E-L-H-E-N-N-E-Y.  You don't know,

18  but I'm going to represent to you that's

19  how it's spelled and represent this to

20  the court reporter.

21                   Why did you file bankruptcy

22  in January of 2002?

23         A.        I had debts, and in

24  particular, this debt with Dr. Brown, and

Flamm

```
 1    I was interested in finding ways to

 2    resolve those debts, and I didn't want

 3    any more people coming to my place of

 4    work harassing me.

 5          Q.        Other than the delivery

 6    person in January of 2002, did anyone

 7    else ever contact you at work about debts

 8    that you owed?

 9          A.        No.

10          Q.        By telephone or in person?

11          A.        No.

12          Q.        Do you know how much you

13    had in debt at that point?

14          A.        No.

15          Q.        Do you know how long before

16    filing the bankruptcy you had considered

17    the matter?

18          A.        No, but I would say it was

19    the time of that October letter because I

20    didn't want any interference at work.  I

21    was getting to a point where I just

22    didn't want my debts to interfere with

23    the life that I was trying to, you know,

24    then create.
```

Flamm

1    discussion with anyone at Pierce about

2    the delivery of the January 2002 letter?

3         A.        No.

4         Q.        Did you ever discuss the

5    delivery of the January 2002 -- let me

6    back up a second.

7               Did the delivery of the

8    January 2002 letter cause you any

9    physical, emotional or psychological

10   complaints?

11        A.        Yes.

12        Q.        What complaints?

13        A.        Anxiety, stress,

14   sleeplessness.

15        Q.        And how long did you

16   experience these symptoms?

17        A.        I would say off and on, for

18   that entire semester, because although my

19   attorney told me that it was illegal for

20   anybody to come, especially after I filed

21   bankruptcy, the server came after I had

22   filed bankruptcy.

23               So, you know, I was still

24   very, very nervous.  I thought that he

Flamm

1   would show up again to speak with the

2   dean at any moment, because he had gone

3   there illegally before or somebody else

4   might show up.  I didn't really trust

5   this whole bankruptcy thing as far as

6   protecting me.

7          Q.        And you started to feel

8   better after the spring semester into

9   2000 -- hang on.

10                   How many semesters do they

11  have at Pierce, two or three a year?

12         A.        Their semesters are

13  ongoing, fall, spring and summer session.

14         Q.        When you say you were

15  experiencing these symptoms during that

16  semester --

17         A.        I would say the symptoms

18  subsided somewhere in the following fall,

19  so through the spring and summer.

20         Q.        So around September, you

21  think?

22         A.        Uh-hum, uh-hum.

23         Q.        Now, during that period

24  from January of 2002 until September of

Flamm

```
 1   2002, how many courses were you teaching?

 2        A.        It varies because sometimes

 3   I take on extra courses.  So, I would say

 4   the minimum, three, and at the --

 5   including the summer.  So, I would say at

 6   the minimum, six; and at the maximum,

 7   eight.

 8        Q.        Six to eight over the

 9   entire course of that period?

10        A.        Right.

11        Q.        Were you pregnant during

12   that period?

13        A.        What are the dates?

14        Q.        We're talking January of

15   2002 until September of 2002.

16        A.        Yes, I was.

17        Q.        I'm sorry that --

18        A.        I think.

19        Q.        I have a feeling you might

20   be better with these dates than me --

21        A.        Wait, wait.

22        Q.        Okay.

23        A.        If the twins were born

24   2003 -- December 18, 2003.
```

Flamm

```
 1                    MR.  MESTER:   Well,  it's

 2          2002,  because  September  2003  would

 3          be  this  past  December.

 4                    THE  WITNESS:   That's  right.

 5                    MR.  MESTER:   I  don't  mean

 6          to  step  in.

 7  BY MR. McDEVITT:

 8          Q.        Twins  12  --

 9          A.        18-02.

10          Q.        Okay.   So,  if  the  twins

11  were  born  12-18-2002,  then  I  suppose  if

12  we  go  back  nine  months,  we're  talking

13  about  March  18,  around  2002  for

14  conception.   Do  you  recall  when  you

15  learned  that  you  were  pregnant  with

16  twins,  what  month?

17          A.        It  was  either  March  or

18  April,  probably  April.

19          Q.        So,  pretty  soon?

20          A.        Yes.

21          Q.        Were  you  trying  for  a  while

22  to  have  children?

23          A.        Off  and  on,  you  know.

24          Q.        Did  your  pregnancy  cause
```

```
 1   alternative treatments like R-E-I-K-I,
 2   R-O-L-F-I-N-G?
 3           A.      No.
 4           Q.      Now, were there any
 5   problems with your bankruptcy or the
 6   bankruptcy filings that you made?
 7           A.      No.
 8           Q.      Do you recall being
 9   directed by the bankruptcy court to
10   submit an amended filing in February of
11   2002?
12           A.      Yes.
13           Q.      Do you know why you
14   submitted an amended filing?
15           A.      I forget what it was.  I
16   don't recall exactly.
17           Q.      Did this needing to submit
18   an amended filing cause you any stress?
19           A.      Yes and -- yes.
20           Q.      Over the course of your
21   pregnancy, did you have any -- did any
22   health issues arise?
23           A.      No.
24           Q.      Do you believe that you've
```

Flamm

1    suffered any financial harm as a result

2    of that January 2002 delivery?

3          A.        I don't know.  It hasn't

4    played out yet.

5          Q.        What do you mean it hasn't

6    played out yet?

7          A.        I don't know what I'm going

8    to owe exactly, I don't know.

9          Q.        What you're going to owe

10   who?

11         A.        Attorneys, that kind of --

12   I don't know what my fees are at this

13   point.

14         Q.        So the financial damage

15   that you believe you might have suffered

16   are the attorney's fees that you've

17   incurred in this lawsuit?

18         A.        Yes.

19         Q.        Do you believe that as a

20   result of the January 2002 delivery of

21   documents, that you haven't progressed as

22   far at your job as you could have?

23         A.        No.

24         Q.        So it didn't affect your

Flamm

1          A.          Not that I recall.

2          Q.          Did you ever have a

3     discussion with the dean at Pierce,

4     something along the lines of Mara, you do

5     a great job as a teacher, but if you had

6     worked a little harder, you might advance

7     here a little more.

8          A.          No, because as a teacher,

9     the way you feel in a classroom affects

10    how you feel about yourself as a teacher,

11    and because I was experiencing

12    nervousness, I felt that I wasn't doing

13    as good as a job.

14               I'm a very good teacher and

15    I know I've done better in the past or

16    the future.  Although I didn't do poorly

17    enough to elicit complaints, I know that

18    my performance wasn't as, you know,

19    effective as it normally is, but I don't

20    recall getting complaints.

21         Q.          At Pierce, does the dean

22    ever, you know, sit faculty members down,

23    say, once a year to provide evaluation?

24         A.          Yes.

Flamm

1      Q.      Are you still uncomfortable

2  with her today?

3      A.      Slightly.

4      Q.      Has that affected your job

5  performance at all?

6      A.      No.

7      Q.      Does Carmita ever act

8  strangely around you, like if she's got a

9  CD player and she sees you coming, she

10  makes sure that it's put away or

11  something?

12      A.      I have not taken note of

13  the behavior, but possibly.

14      Q.      But you've never noticed

15  any kind of behavior like that?

16      A.      I'm very busy, I just don't

17  pay attention to that kind of stuff, I

18  can't.

19      Q.      What information do you

20  possess that you believe supports the

21  idea that Mr. Matosavage was employed by

22  Sarner & Associates?

23      A.      He said he was delivering

24  this for them.