**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| MARA FLAMM, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : | NO. 02-4302 |
|  | : |  |
| v. | : |  |
|  | : |  |
| SARNER & ASSOCIATES, P.C. and | : |  |
| JOSHUA SARNER, ESQUIRE and | : |  |
| LEONARD SARNER, ESQUIRE and | : |  |
| JODI H. BROWN, M.D. and JOHN | : |  |
| MATUSAVAGE | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

<u>**MEMORANDUM**</u>

M. FAITH ANGELL                                    January 3, 2006
CHIEF UNITED STATES MAGISTRATE JUDGE

On March 7, 2003, the parties in this action filed a consent to jurisdiction by a United States Magistrate Judge, and, on March 11, 2003, the matter was referred to me by the Honorable Herbert J. Hutton for all further proceedings and the entry of judgment. *See* Docket Entries 44 and 46. Presently before this court is a motion for summary judgement filed by Defendants Sarner & Associates, PC; Joshua Sarner and Leonard Sarner[1] (Sarner Defendants), and a motion for summary judgment filed by Defendant John Matusavage.[2] Upon

---

[1] Plaintiff's counsel indicated that Ms. Flamm will withdraw her putative claims against Leonard Sarner.

[2] Defendant Brown was terminated on October 27, 2004, pursuant to "praecipe to mark case settled, discontinued and ended as to Dr. Jodi Brown by Mara Flamm" (Docket Entry No. 62).

-1-

consideration of these motions, the Plaintiff's omnibus response, the record, and the applicable case law, and as discussed more fully below, Defendants' motions will be denied.

## I. FACTUAL BACKGROUND[3]

The history of this case was set forth by the Honorable Lowell A. Reed, Jr. in his Memorandum and Order dated November 6, 2002, in which he granted in part and denied in part Defendants' motions to dismiss, as follows:

> Plaintiff Mara Flamm (Ms. Flamm) was sued by Dr. Brown in the Municipal Court of Philadelphia County for $5000. On or about April 4, 2001, the Municipal Court of Philadelphia County entered a default judgment in favor of Dr. Brown and against Ms. Flamm in the amount of $6,215 plus $65 in costs. On or about October 26, 2001, Mr. Matusavage served a Notice of Deposition in Aid o[f] Execution (Notice) on plaintiff by leaving a copy with plaintiff's supervisor at Peirce College where plaintiff was employed. Mr. Matusavage informed plaintiff's supervisor that plaintiff owed a large debt to a doctor.
>
> On January 25, 2002, Mr. Matusavage again appeared at Peirce College and demanded to see plaintiff, plaintiff's supervisor, the Dean of the College, and their secretaries. Carmita Rutling (Ms. Rutling), an administrative assistant of Peirce College, spoke with the process server at the request of campus security. Mr. Matusavage asked Ms. Rutling to accept a package on behalf of plaintiff and further requested to speak with Ms. Rutling in

---

[3]The factual background is compiled from a review of the complaint, Defendants' answers with new matter and crossclaims, replies to the crossclaims, the amended complaint, as well as the Defendants' motions for summary judgment and Plaintiff's omnibus response, inclusive of all exhibits thereto, and the court record. All facts, and reasonable inferences therefrom, are considered in the light most favorable to the non-moving party.

private.  Upon following her to a room near
by, he began to yell in a loud and aggressive
tone.  Mr. Matusavage stated, "I don't know
what type of sneaky little thieves you hire,
but Mara Flamm stole thousands of dollars from
a doctor and hasn't paid."  He complained that
he and the Sarner Defendants had been going to
Peirce College for over two years and that
plaintiff was always unavailable.  When Ms.
Rutling advised Mr. Matusavage that the
information was none of her business, and that
he should contact plaintiff at home, Mr.
Matusavage remarked that plaintiff had given
them a false home address and phone number.
He further stated that plaintiff had received
services for which she refused to pay and that
she failed to appear in court.  Mr. Matusavage
then reiterated that plaintiff was a thief,
and that if plaintiff was the type of person
Peirce College had working for them, the
school was in trouble.  Finally, he requested
that Ms. Rutling inform plaintiff that the
next time they had to go to her place of
employment, they would bring a sheriff and
have plaintiff arrested.  *Flamm v. Sarner &
Associates*, 2002 WL 31618443 *1 (E.D.Pa.
November 6, 2002) (internal footnotes
omitted).

## II.  <u>MOTION FOR SUMMARY JUDGMENT</u>

_____In their motion for summary judgment, the Sarner Defendants

make the following argument concerning Ms. Flamm's claims:

1.  The Sarner Defendants are not "debt collectors" within the

meaning of the Fair Debt Collection Practices Act (FDCPA) and

cannot be held liable under that statute.

2.  The Sarner Defendants cannot be held liable for the

actions of their independent contractor, John Matusavage.

3.  The Sarner Defendants cannot be held liable under the

FDCPA for the service of legal process alone.

-3-

4. Plaintiff cannot set forth a cause of action under the Unfair Trade Practices and Consumer Protection Law (CPL) in the absence of ascertainable damages to money or property.

5. Plaintiff cannot set forth a claim of defamation in the absence of damage to Plaintiff's reputation.

6. Plaintiff cannot set forth a claim for conspiracy in the absence of an agreement between the parties to commit an unlawful act. *See* Sarner Defendants Memo at i-ii.

In Mr. Matusavage's motion for summary judgment, he moves the Court to enter summary judgment in his favor on all claims for the reasons set forth in the Sarner Defendants' motion for summary judgment, excepting their "overly-restrictive vicarious liability argument". *See* Matusavage Motion at [1].

## III. __DISCUSSION__

### A. __Legal Standard__

Summary judgment is only appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e)

When the non-moving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial. *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329 (3rd Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.C. 2548,

-4-

2552-53, 91 L.Ed.2d 265 (1986).  A nonmoving party creates a genuine issue of material fact when it provides evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.C. 2505, 2510, 91 L.Ed.2d 202 (1996).  *See also Lawrence v. National Westminster Bank of New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996).

**B.    Analysis**

(1)    <u>Whether the Sarner Defendants are "Debt Collectors" within the meaning of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.* and can be held liable under that statute.</u>

The Sarner Defendants claim that they are not "debt collectors withing the meaning of the FDCPA, and, consequently, they cannot be held liable under that statute.  Ms. Flamm asserts that the facts herein belie that contention.

"The stated purpose of the FDCPA is to 'eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.' 15 U.S.C. § 1692(e)."  *Flamm*, 2002 WL 31618443 at *2.  "It is uncontested that the money owed by Ms. Flamm constitutes a 'debt' as defined in 15 U.S.C. § 1692a(5)."  *Id.*  The Sarner Defendants, however, assert that they are not "debt collectors" within the meaning of the statute.  The FDCPA states that a debt collector is:

Any person who uses any instrumentality

-5-

> of interstate commerce or the mails in any
> business, the principal purpose of which is
> the collection of debts, or who regularly
> collects or attempts to collect, directly or
> indirectly, debts owed to or due to another.
> *1*15 U.S.C. § 1692(a)B.

The Sarner Defendants aver that Ms. Flamm cannot prove that they "regularly attempt to collect debts alleged to be due another" as she alleges.  Complaint, ¶ 4.

As both Ms. Flamm and the Sarner Defendants have made clear, there is no bright line rule as to what percentage of one's practice comprising collection cases satisfies the term "regularly."  *Silva v. Mid-Atlantic Management*, 277 F.Supp.2d 460 (E.D.Pa. 2003) and *Crossley v. Lieberman*, 868 F.2d 566 (3rd Cir. 1989) provide some guidance on this issue.  The court in *Silva* found that the defendant attorneys were debt collectors, despite less than 1% of their practice being devoted to such, due to their consistent solicitation and acceptance of debt collection matters. *See Silva*, 277 F.Supp at 464.  In *Crossley*, the defendant accepted several debt collection cases per year and also had an ongoing relationship with one client for whom he consistently handled debt collection cases.  *See Crossley,* 868 F.2d at 570.

The Sarner Defendants have a law practice that consistently has a small percentage of debt collection cases.[4]  They contend,

---

[4]From 1998 to 2002, collections cases represented nine (9) of the 273 cases that Joshua Sarner personally opened and worked on at Sarner & Associates, or 3.2% of these cases.  Collections cases represented four (4) of the 224 clients that he personally represented or 1.7% of all clients that he personally represented during that period.  Collections cases represented 3% of the revenues

however, that a majority of their debt collection cases, 80% in the 2000-2002 period, was for just one client.  These statistics show a consistent taking and handling of debt collection cases from one individual (Dr. Brown) while retaining an active, albeit small, practice of solicitation from the area at large.

Though the Sarner Defendants assert that they do not market themselves as collections attorneys and do not presently accept collections cases,[5] the Philadelphia Bar Association's Lawyer Referral Service lists Joshua Sarner as an individual who accepts debt collection cases.  *See* Sarner Defendants Memo, Exhibit 2 at 86-91.  Further, Joshua Sarner does not preclude the possibility of accepting future debt collection cases.  *See* Sarner Defendants Memo, Exhibit 2 at 90.

From the evidence presented, a reasonable jury could find that the Sarner Defendants are debt collectors under the FDCPA.  On this basis, the granting of a motion for summary judgment on this claim would be inappropriate.

    (2)  <u>Whether the Sarner Defendants can be held liable for the actions of John Matusavage.</u>

It has been alleged that Defendant Matusavage acted improperly when he served the Notice of January 25,2002,at Peirce College.

---

that he personally generated.  *See* Sarner Defendants Memo, Exhibit 1 at [6].

[5]*Id.* at [2]; Exhibit 2 at 90; 158.

-7-

Ms. Flamm asserts that he did so as a debt collector[6] employed by the Sarner Defendants,[7] thus making them vicariously liable for his actions which allegedly violated the FDCPA.   Defendants respond that Matusavage was not an employee of the Sarner Defendants, but he was an independent contractor.   As a result, the Sarner Defendants cannot be held responsible for his actions.

As the Third Circuit stated in *Pollice v. National Tax Funding, LP*, 225 F.3d 379 (3d Cir. 2000), "[a]lthough there is relatively little case law on the subject of vicarious liability under the FDCPA, there are cases supporting the notion that an entity which itself meets the definition of "debt collector" may be held vicariously liable for unlawful collection activities carried out by another on its behalf."   *Id.* at 404.   The Court notes that the Ninth Circuit, in *Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994)found that "a company which had been asked to collect a defaulted debt could be held vicariously liable for

---

[6]Judge Reed discussed Mr. Matusavage's status as a "debt collector" vs. "process server" as follows:

> I find that a person who goes beyond being merely a messenger in serving legal process and engages in prohibited abusive or harassing activities to force an individual to repay a debt is no longer exempt under the legal process server exception.   At that point, he steps beyond the bounds of the official duties inherent in serving process and takes on a secondary role of "debt collector" as defined within the statute.   To find otherwise would both "stretch the statutory language" and "significantly impede the statute from remedying the 'mischief' to which it was addressed."   Based upon the protective purposes of the FDCPA and the facts as alleged in the complaint, I find that Mr. Matusavage is not exempt from liability through his process server status.   *Flamm*, 2002 WL 31618443 at *5.

[7]*See* Sarner Memo at 18.

its attorney's conduct which was in violation of the FDCPA".
*Pollice*, 225 F.3d at 404.    However, the Sixth Circuit, in
*Wadlington v. Credit Acceptance Corporation*, 76 F.3d 103, 108 (6th
Cir. 1996), declined to impose vicarious liability on a company
which did not meet the definition of "debt collector".

It must first be decided whether or not the Sarner Defendants
fall within the regulatory provisions of the FDCPA before it can be
decided if they are vicariously liable for Mr. Matusavage's
actions.    The granting of a motion for summary judgment for this
claim would be inappropriate.

(3)    <u>Whether the Sarner Defendants can be held liable under
the FDCPA for the service of legal process alone.</u>

Ms. Flamm alleges that Defendants' attempt to serve process
upon her was improper under the FDCPA and the CPL in that Mr.
Matusavage tried to contact her at her place of employment, without
prior consent. when Defendants knew she was represented by counsel.
*See* Complaint at ¶¶ 49(a), 49(d).[8]  The Sarner Defendants assert
that Mr. Brand did not identify himself as counsel to Ms. Flamm
until March 25, 2002.  *See* Sarner Defendants Memo, Exhibit 17.

Pennsylvania Rule of Civil Procedure 440(a)(2)(i) states:

> If there is no attorney of record, service
> shall be made by handing a copy to the party
> or by mailing a copy to or leaving a copy for
> the party at the address endorsed on an
> appearance or prior pleading or the residence

---

[8]Ms. Flamm does not address this issue in her Omnibus Response to
Defendants' motions for summary judgment.

-9-

or place of business of a party.
The disagreement among the parties in regard to whether or not Ms. Flamm was represented by counsel at the time of Mr. Matusavage's service of process at Peirce College is evident.

Were this issue resolved, and if it was determined that Defendants were subject to the FDCPA, a reading of 15 U.S.C.A. § 1692a(6)(D) would exempt from the definition of "debt collector" "any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt". Judge Reed, however, found Mr. Matusavage to fall within the parameters of the definition "debt collector", rather than mere process server.

Due to these unresolved questions, a granting of summary judgment on this claim is unwarranted.

(4)  <u>Whether Ms. Flamm can set forth a cause of action under the CPL.</u>

Defendants assert that Ms. Flamm has not experienced any "ascertainable loss of money or property", and, therefore, is not able to recover damages under the CPL.[9]  Needless, to say, she

---

[9]The Consumer Protection Law states in pertinent part:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.  The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars

-10-

disagrees.

"[D]ebt collection has been deemed to be activities within trade or commerce as regulated under the [CPL]." *Flamm*, 2002 WL 31618443 at *6.

> Further, pursuant to the [CPL], the Pennsylvania Fair Credit Extension Uniformity Act ("PFCEUA"), 73 Pa.C.S. §§ 2270.1 *et seq.*, was passed and became effective in June 2000. The PFCEUA established what activities constitute "unfair methods of competition and unfair or deceptive acts or practices with regard to the collection of debts." 73 Pa.C.S. § 2270.2. Under the PFCEUA, any act of a debt collector that violates any of the provisions of the FDCPA also violates the PFCEUA. *See* 73 Pa.C.S. § 2270.4(a). Thus, to the extent plaintiff has alleged a FDCPA claim against the Sarner Defendants and Mr. Matusavage, she has also stated a claim under the PFCEUA and [CPL] for relief. *Id.*

It remains for Ms. Flamm to present to a jury her "ascertainable damages" for which she may recover "actual damages or one hundred ($100), whichever is greater". Defendants' motions for summary judgment will be denied for this claim.

(5) Plaintiff's defamation claim

Defendants aver that Ms. Flamm cannot set forth a claim of defamation in the absence of damage to her reputation. Ms. Flamm finds this argument meritless and states that she "suffered physical, emotional and/or psychological harm" due to the actions

---

($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney's fees. 73 P.S. § 201-9.2(a).

of the Sarner Defendants and Mr. Matusavage. *See* Plaintiff's Omnibus Response at [23].

Under Pennsylvania law, in a cause of action claiming defamation, the plaintiff must establish: "1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) the understanding by the recipient of its defamatory meaning; 5) the understanding by the recipient of it as intended to be applied to the plaintiff; 6) special harm resulting to the plaintiff from its publication; and 7) abuse of a conditionally privileged occasion." 42 Pa. C.S.A. § 8343(a). *See also Pennoyer v. Marriott*, 324 F.Supp.2d 614 (E.D.Pa. 2004); *Tucker v. Fischbein*, 2005 WL 67076 (E.D.Pa. 2005).

> A statement is defamatory 'if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *Flamm*, 2002 WL 31618443 at *7 (internal quotations omitted).

"Under Pennsylvania law, it is for the court to determine whether the statement at issue is capable of defamatory meaning." *Pennoyer*, 324 F.Supp.2d at 618.

As previously stated, one of the requirements of a defamation claim is a showing of "special harm" to the plaintiff as a result of its publication. "[S]pecial harm" is defined as 'actual damages which are economic or pecuniary losses.'" *Id.* (*quoting Sprague v. Am. Bar Ass'n., 276 F.Supp.2d 365, 368-69 (E.D.Pa. 2003) (quoting*

*Restatement (Second) of Torts,* § 575, cmt. b *(1997)).* However, in
Pennsylvania, there is an exception to the "special harm"
requirement for slander actions - claims made on oral defamation.
*See Pennoyer*, 324 F.Supp.2d at 618.

> A plaintiff may succeed in a claim for
> defamation absent proof of special harm where
> the spoken words constitute slander *per se*.
> There are four categories of words that
> constitute slander *per se*: words that impute
> (1) criminal offense, (2) loathsome disease,
> (3) business misconduct, or (4) serious sexual
> misconduct. *Id.* (citations omitted).

"Under Pennsylvania law, a defendant who publishes a statement
which can be considered slander *per se* is liable for the proven,
<u>actual</u> harm that the publication causes. To show actual damages in
a defamation claim, the plaintiff must show competent proof." *Id.*
(emphasis in original).

> Actual damages are divided into two
> types: general and special. "General" damages
> typically flow from defamation, such as:
> impairment of reputation and standing in the
> community, personal humiliation, and mental
> anguish and suffering. The Restatement
> (Second) of Torts requires a victim of slander
> *per se* to make some showing of general damage,
> although he need not prove "special damage".
> Proof of general damages is required, since it
> accommodates the Court's interest in
> maintaining some type of control over the
> amount that a jury should be entitled to
> compensate an injured. In determining if a
> plaintiff has demonstrated any loss to
> reputation, it must be measured by the
> perception of others, rather than that of the
> plaintiff himself because reputation is the
> estimation in which one's character is held by
> his neighbors or associates. *Pennoyer*, 324
> F.Supp.2d at 619.

-13-

Ms. Flamm "alleges that Mr. Matusavage characterized her as a 'thief' who stole thousands of dollars from a doctor." *Flamm*, 2002 WL 31618443 at *7. If these characterizations were, in fact, made, they would certainly constitute slander *per se*. However, Mr. Matusavage, under oath, states that he did not call Ms. Flamm a thief,[10] and Ms. Rutling, also under oath, states that he did make

---

[10]    A.  So I waited a few minutes, ten, five, ten minutes and Professor Flamm didn't show up.  And I asked him to call the supervisor.  And security got on the phone and I spoke with a Miss Rutling for a few minutes.

She says, "I'll be right down."
She came down.  And I says, "Miss Rutling, I have this document for Professor Flamm.  Is there a place we can talk privately?  I want to make sure she gets this."
So we went into a little side room.
I says, "Miss Rutling, this is for Professor Flamm.  I've been here before. I haven't found her because she's not here.  She's supposed to be teaching and she's not there."  I said, "Could you make sure she gets this?"
She says, "Okay".
I said, "Thank you" and out the door I went

Q. Do you recall raising your voice to Miss Rutling?

A.  No.

Q.  Do you recall making any statements about Miss Flamm?

A.  No.
                            . . . . .
Q.  Did you tell Miss Rutling that Miss Flamm was a dirty little thief?

A.  No.

                            . . . . .
Q.  When you spoke with Carmita Rutling on January 24, 2002, you didn't tell Miss Rutling that Miss Flamm owed six thousand dollars to a doctor?

A.  No, I did not.

Q.  When you spoke with Miss Rutling, you didn't tell Miss Rutling that Miss Flamm had been giving different names or addresses to people?

A.  No, I did not.

Q.  You did not yell at Miss Rutling?

-14-

those comments.[11]  Due to this initial genuine issue of material fact, a granting of summary judgment would be inappropriate.

    (6)  <u>Plaintiff's civil conspiracy claim</u>

      Ms. Flamm asserts a claim for civil conspiracy.  She alleges that Defendants conspired with malice to compel her to repay her debt through means of harassment and coercion.  *See Flamm*, 2002 WL 31618443 at *8.  Defendants aver that she cannot set forth a claim for conspiracy in the absence of an agreement between the parties to commit an unlawful act.

      "Under Pennsylvania law, a civil conspiracy requires (1) two or more person[s] who combine or agree with an intent to do an

---

    A.  No, I did not.

    Q.  You did not tell Miss Rutling that a sheriff would come and arrest Miss Flamm?

    A.  No, I did not.

    Q.  And you did not call Mis Flamm a sneaky little thief?

    A.  No, I did not.

N.T. 1/17/05 at 55-56, 68-69.

    [11]A.  So I went into one of the empty offices on the first floor, it was just like a round the corner.  And he just started talking.  His whole demeanor and everything was like just very angry and very aggressive.

    And I asked him who he was.  And he didn't tell me who he was, he just told me that I work for this doctor, and you know, we're trying to collect money and everything, and she's a thief.  And he went on and on talking about Mara being a thief and do I know that we have thieves working for the college and things like that.
           .  .  .  .  .
    And as he was talking and everything – I felt like he was talking to me as if I was Mara, you know.  He was pointing his fingers, do you know this little thief, this, that and the other.

    And he told me that the next time he comes down here, he's not going to be alone, he's bringing the sheriff and she will be arrested.  N.T. 8/16/04 at 30-32.

unlawful act or to do an otherwise lawful act by unlawful means, and (2) proof of malice, i.e., an intent to injure." *Id.* (internal quotations omitted).

The question then becomes whether or not Mr. Sarner and Mr. Matusavage agreed and intended to "do an unlawful act or an otherwise lawful act by unlawful means".  Mr. Sarner testified that he did tell Mr. Matusavage that Ms. Flamm owed a debt to a doctor, and he may have mentioned the amount of the judgment to him,[12] but he did not give Mr. Matusavage instructions as to how to effectuate service upon her.[13]  Mr. Sarner testified that he never referred to Ms. Flamm as a thief in Mr. Matusavage's presence or as a "sneaky little thief".  N.T. 11/17/04 at 145.  He did not instruct Mr. Matusavage to harass Ms. Flamm or anybody at her place of employment, nor did he instruct, or otherwise suggest to Mr. Matusavage that he defame Ms. Flamm.  *Id.* at 145-146.

---

[12]Q. Did you tell John Matusavage that Mara Flamm owed a debt to a doctor?

A. I did.

Q. Did you tell John Matusavage how much was owed to the doctor?

A. I don't recall.

Q. Do you know whether John Matusavage had any knowledge from any source about $6,000 was owed by Ms. Flamm to Dr. Brown?

A. I don't know.  I may have mentioned it to him.  I may have mentioned it to him.  I may have mentioned it to him that this was a $6,000 judgment. I don't recall whether I did or didn't.  N.T. 11/17/04 at 143.

[13]A. And I had hired him to do a particular job, a specific job, and that specific job was to serve these papers on Mara Flamm. I didn't in any way give him instructions as to how to do that job other than to say this is where I think she is, and you go ahead and serve it there.  I didn't control the means and methods by which he did it.  I didn't tell him who to drop it off to, what to say.  I didn't give him any of those kinds of instructions.  *Id.* at 74.

-16-

Similarly, Mr. Matusavage testified that he was not instructed to scare or intimidate someone upon whom he was serving process.[14] In fact, he states that "[he has] no knowledge of what was inside the envelope. N.T. 1/17/05 at 59. Mr. Matusavage asserts that Mr. Sarner never said anything to him about Ms. Flamm prior to the service of process.[15]

> Q. When you went over to Josh to pick this up, did you talk about Miss Flamm?
>
> A. No.
>
> Q. When you were talking with Josh that time, did he refer to Miss Flamm as a thief or a dirty little thief?
>
> A. Not to my knowledge.
>
> Q. Did he provide you with any additional instructions about how to get this served in such a way that it wouldn't come back?
>
> A. No.
>
> Q. Now, did Mr. Sarner tell you to be rude or threatening?
>
> A. No.
>
> Q. Did Mr. Sarner tell you to talk to Miss

---

[14]Q. Did any of the attorneys you've ever served process or Complaints for instruct you to scare or intimidate the person who's listed on the envelope?

A. I don't do work for attorneys that handle that type of, carry that attitude. If they want to intimidate somebody, they'll do it. I'm not going to be their paid goon. I handle everything on my own. N.T. 1/17/05 at 29.

[15]Q. What do you recall about that first contact with Josh Sarner?

A. He wanted a document served to a Professor Mara Flamm.

Q. Do you remember what he told you about Professor Flamm?

A. He never said anything about Professor Flamm. N.T. 1/17/05 at 32.

-17-

Flamm's supervisors about the case?

A. No.

Q. Did Mr. Sarner tell you to call Miss Flamm names?

A. No

Q. Did Mr. Sarner tell you to intimidate Miss Flamm?

A. No.  N.T. 1/17/05 at 60.

Though Mr. Matusavage testified that he knew nothing about the contents of the envelope he served upon Ms. Flamm, Mr. Sarner stated that he told Mr. Matusavage that Ms. Flamm owed money to a doctor, and he may have told him the amount owed.  Further, in another collection case that Sarner and Associates handled for Dr. Brown, the word "thieves" was mentioned in reference to defendants.[16]  That characterization seems hauntingly similar to what is alleged herein.  Questions are raised which prevent a granting of summary judgment on this claim.

---

[16]A letter from defendants' counsel to Mr. Sarner dated March 23, 2000, concerning *Brown v. D-----* reads in pertinent part:

> It was a pleasure speaking with you earlier.  As I am sure you are well aware, Mr. And Mrs. D— initially contacted Dr. Brown when they learned that they mistakenly deposited monies into their account for personal use, which were intended for Dr. Brown. Additionally, Mr. And Mrs. D– had offered to reimburse Dr. Brown at a rate of $100 per month toward the amount due of $1,232.00.  Accordingly, your repeated reference to my clients as "thieves", is inappropriate and unprofessional when discussing a resolution of this dispute.  Plaintiff's Omnibus Response, Supp. Exh. T.

## IV.  <u>CONCLUSION</u>

Consistent with the above discussion, the Motions for Summary Judgment filed by the Sarner Defendants and John Matusavage are denied.